Thiyagarajah **ADHIYAPPA**, Petitioner,

v.

**IMMIGRATION AND
NATURALIZATION SERVICE,**
Respondent.

No. 94–3396.

United States Court of Appeals,
Sixth Circuit.

Argued March 16, 1995.

Decided June 28, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied Sept. 13, 1995.*

* Daughtrey, Circuit Judge, would grant rehearing    for the reasons stated in her dissent.

Drew S. Diehl (argued and briefed), Firooz T. Namei, McKinney & Namei, Cincinnati, OH, for petitioner.

Francesco Isgro (argued and briefed), Richard M. Evans, Ellen Sue Shapiro, Donald Keener, U.S. Dept. of Justice, Immigration Litigation, Civ. Div., Washington, DC, Edmund A. Sargus, Jr., U.S. Atty., Office of the U.S. Atty., Columbus, OH, for respondent.

Before: KENNEDY and DAUGHTREY, Circuit Judges; CLELAND, District Judge.**

CLELAND, D.J., delivered the opinion of the court, in which KENNEDY, J., joined. DAUGHTREY, J. (pp. 268–70), delivered a separate dissenting opinion.

CLELAND, District Judge.

Thiyagarajah Adhiyappa ("Petitioner") seeks review, pursuant to 8 U.S.C. § 1105a(a), of a final order of deportation issued by the Board of Immigration Appeals. While conceding deportability under 8 U.S.C. § 1251(a)(4) [1], which permits deportation of an alien who is convicted of two crimes involving moral turpitude, Petitioner seeks asylum under 8 U.S.C. § 1158(a), withholding of deportation pursuant to 8 U.S.C. § 1253(h), and voluntary departure pursuant to 8 U.S.C. § 1254(e). We deny the petition.

### I.

In order to prevail on his petition for asylum or withholding of deportation, Petitioner must show, *inter alia*, that he has a

---

** The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. The applicable statute is the one in effect on the date deportation proceedings commenced, April 29, 1989. (Joint Appendix 99). The parties agree that the applicable section is § 1251(a)(4). (Petitioner's Brief 3, Respondent's Brief 4). This statute was subsequently reorganized; under the current scheme, the applicable section is § 1251(a)(2)(A)(ii). The substance of the law, however, has not changed.

well-founded fear of persecution in Sri Lanka, his country of origin, on account of his political opinion, or that his life or freedom would be threatened in Sri Lanka on account of his political opinion. Accordingly, a short review of the history of Sri Lanka and its current political situation—neither of which was disputed by the parties—is appropriate.[2]

## A. Background Facts

Sri Lanka is a small island nation approximately 270 miles from north to south and approximately 140 miles from east to west. Formerly known as Ceylon, it is just off India's southeast coast. Approximately 74 percent of the population are Sinhalese; 12.5 percent Sri Lankan Tamils, who migrated to Sri Lanka from southern India many centuries ago; seven percent are Muslim; and 5.5 percent are Indian Tamils—more recent arrivals brought there by the British to work the tea estates in the central part of the country. Petitioner is an Indian Tamil.

Since its independence from Britain in 1948, the Sinhalese have been in power in Sri Lanka. Sinhalese has been made Sri Lanka's official language and Buddhism its religion. Sinhalese receive preference in hiring for the civil service and university admissions. Indian Tamils, on the other hand, are a disadvantaged group in Sri Lanka; they are both exploited and ignored—the untouchables of Sri Lanka. Petitioner's status as an Indian Tamil is stated on his birth certificate and, because of that status, he was not given Sri Lankan citizenship until he turned 25 years old. The Sri Lankan Tamils fall in between the Sinhalese and the Indian Tamils on the social scale in Sri Lanka.

Since it became independent from Britain, Sri Lanka has been rocked by political, religious, cultural, and ethnic violence. A major area of contention has been the proposal that part of the island be established as a separate Tamil nation controlled by the Sri Lankan Tamils. The separate state would include approximately one-third of the country in the north and east. Sri Lankans Tamils generally favor this proposal, while Sinhalese

and Indian Tamils generally oppose it. Petitioner strongly opposes the creation of a separate Tamil nation.

Petitioner earned a graduate degree in geography from the University of Peradeniya, and, in September 1980, he obtained a position as a geography instructor at Jaffna University in Sri Lanka. In March 1981, the chancellor of the university asked Petitioner to be an assistant student advisor, and Petitioner accepted the position. His duties included advising freshmen students; observing Sri Lankan Tamil student group activities at the campus and attempting to prevent terrorist activities; and cooperating with Sri Lankan security forces' investigations of student activities. In short, part of his job was to inform university and government officials about Sri Lankan Tamil student activists who were taking action to pressure the government to create a separate Tamil nation. He performed this role until 1983. Petitioner also encouraged students not to get involved in Sri Lankan Tamil terrorist organizations.

Petitioner testified at his hearing that members of militant separatist groups would come to his house, which he shared with other instructors, call him a traitor, and threaten to kill him if he continued to provide names to the authorities. (Joint Appendix 14–15). Because Petitioner was on the side of the government, he felt some protection from the separatists. However, the government's control over northern Sri Lanka began to erode, and its ability to check the terrorists began to recede. In 1983, Petitioner began to fear for his life. Around this time, the court system ceased operating because of the terrorists' threats to the judges and others. As a result of this situation, Petitioner fled to the United States in August 1983. One of his colleagues, a lawyer who represented the Jaffna area in the national parliament, fled to India about the same time. When that colleague returned to Sri Lanka in 1986, though, he was assassinated. Petitioner's colleague was one of many people deemed by the militants as traitors

---

2. Most of the following background information is extracted from Petitioner's Personal Statement

(Joint Appendix 174–180).

and killed. Petitioner asserts that he fears a similar fate if forced to return to Sri Lanka.

Subsequent to Petitioner's flight to the United States, there have been movements toward peace in Sri Lanka, but those efforts have been, for the most part, unsuccessful. Tamil separatist organizations operate openly throughout the northern and eastern sections of the country, in areas not controlled by the Sinhalese government. Though provisional governments have been elected, the terrorist organizations continue to operate in opposition to the government. Petitioner testified at his hearing before the immigration judge that the Tamil terrorist organizations "control everything." "They make rules, they enforce rules, they mainly kill their enemies. Whoever they think is enemies, they just kill them. There is no justification or anything." (Joint Appendix 150).

Petitioner has lived in Cincinnati, Ohio with his wife since entering the United States with student visas in 1983. He is 41 years old. On April 14, 1987 and on February 28, 1989, he was convicted of theft offenses. On the first occasion, he pleaded no contest to a charge that he had placed one transistor battery in his pocket while shopping for groceries; on the second occasion, he pleaded no contest to a charge that he transferred the price tag from one television set to a similar one which did not have a price tag.

### B. Procedural History

Respondent Immigration and Naturalization Service ("INS") commenced immigration proceedings against Petitioner in 1989 pursuant to 8 U.S.C. § 1251(a)(4), which provides authority for the Attorney General to deport any alien who, at any time after entry into the United States, is convicted of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct. In the deportation proceedings and before this court, Petitioner conceded deportability on the basis of his two misdemeanor convictions but sought asylum pursuant to 8 U.S.C. § 1158(a), withholding of deportation pursu-

ant to 8 U.S.C. § 1253(h), and voluntary departure pursuant to 8 U.S.C. § 1254(e).

In a July 10, 1989 hearing, the immigration judge denied Petitioner's request for voluntary departure on the ground that Petitioner falls within the class of persons statutorily ineligible for voluntary departure, aliens who have been convicted of two crimes involving moral turpitude. Petitioner does not press for the voluntary departure relief before this court.

The immigration judge conducted another hearing on December 11, 1989, to consider the requests for asylum and withholding of deportation. At the conclusion of the hearing, the immigration judge issued an oral decision in which he found Petitioner to be deportable and denied each of the applications for relief. (See Joint Appendix, 92–97). To qualify for asylum, Petitioner must show that he is a

> person who is outside any country of such person's nationality ... and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). *See also,* 8 U.S.C. § 1158(a). The applicable standard for withholding of deportation is similar to the standard for asylum but provides less discretion to the attorney general in deciding whether or not to deport. 8 U.S.C. § 1253(h) provides:

> (h)(1) The Attorney General shall not deport or return any alien (other than an alien described in section 241(a)(19)) [3] to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

The immigration judge concluded that Petitioner does have a political opinion, but that

---

**3.** This section relates to aliens who assisted in Nazi persecution or engaged in genocide. *See* 8

U.S.C. § 1251(a)(4)(D).

he had not provided sufficient evidence that his position "is the concern of anybody at this time. Particularly in light of the recent accords as to whether or not there should or should not be a separate state." (Joint Appendix 95–96). The immigration judge noted that there is civil unrest, but he concluded that Petitioner failed to show that there is a persecutor in Sri Lanka who would be aware of Petitioner's political opinion and willing and able to persecute him on account of it. The immigration judge further noted, "[T]he terrorist groups the respondent [Petitioner here] referred to do not seem to be operating heavily in that area. At least the respondent [Petitioner] has not offered evidence to establish such." (Joint Appendix 96). Thus, the immigration judge determined that Petitioner failed to establish that he was persecuted or has a well-founded fear of persecution.

Petitioner timely appealed to the Board of Immigration Appeals ("the Board") the immigration judge's denials of the requests for asylum and withholding of deportation. In July 1993, while the appeal was pending, Petitioner requested that the Board remand the matter to an immigration judge for consideration of new evidence. On February 8, 1994, the Board issued a decision and final order of deportation, denying the motion to remand and affirming the decision of the immigration judge. The Board determined that Petitioner had failed to demonstrate that the persecution he alleged he had suffered and feared he would suffer again would be on account of his political opinion or some other required basis[4]. The Board focused on the *reason* for the allegedly feared persecution, rather than whether Petitioner reasonably feared persecution. The Board wrote,

> He asserts that he mainly fears Tamil militants, as they made threats against him over a decade ago for informing authorities about students involved in their movement. Yet the respondent has not established that any interest the Tamil militants might still have in him would be on account of his race, religion, nationality, membership in a particular social group, or political opinion. Their interest would appear to be for retaliation against a perceived informer, which would not be persecution on account of a protected status; it is reasonable to assume that the retaliation would occur regardless of what political opinion, if any, the respondent held.

(Joint Appendix 8). On April 14, 1994, Petitioner timely petitioned this Court for review.

## II.

Review of the Board's factual determinations is subject to the substantial evidence standard of review. The statute provides that "the Attorney General's findings of fact, if supported by reasonable, substantial, and probative evidence on the record considered as a whole, shall be conclusive." 8 U.S.C. § 1105a(a)(4). "All the substantial evidence standard requires is that the BIA's conclusion, based on the evidence presented, be substantially reasonable." *Klawitter v. INS*, 970 F.2d 149, 151 (6th Cir.1992) (quoting *Diaz–Escobar v. INS*, 782 F.2d 1488, 1493 (9th Cir.1986)). "Substantial evidence is thus a deferential standard which 'plainly does not entitle a reviewing court to reverse ... simply because it is convinced that it would have decided the case differently.'" *Klawitter*, 970 F.2d at 151–152 (quoting *Dicicco v. INS*, 873 F.2d 910, 912 (6th Cir. 1989)). "[I]n order to reverse the BIA's factual determinations, the reviewing court must find that the evidence not only supports a contrary conclusion, but indeed *compels* it." *Klawitter*, 970 F.2d at 152 (citing *INS v. Elias–Zacarias*, 502 U.S. 478, 481, n. 1, 112 S.Ct. 812, 815, n.1, 117 L.Ed.2d 38 (1992)). Legal determinations are reviewed *de novo* by the court. *Desir v. Ilchert*, 840 F.2d 723, 726 (9th Cir.1988).

## III.

### A. Voluntary Departure

Petitioner is not entitled to voluntary departure under U.S.C. § 1254(e). That section provides a specific exception for aliens within the provisions of § 1251(a)(2)-(4); § 1251(a)(4) is the subsection which refers to aliens who have been convicted of two crimes

---

4. The only ground which Petitioner has pressed     is "political opinion."

involving moral turpitude; and Petitioner has admitted that he falls within that classification. The statute provides no authority to permit voluntary departure for such aliens. Petitioner recognized this at the July 10, 1989 hearing, and he has not pursued the issue here. Accordingly, the petition for voluntary departure is denied.

## B. Asylum and Withholding of Deportation

■ In order to gain asylum, Petitioner must show that he meets the statutory definition of "refugee." 8 U.S.C. § 1158(a) provides, in pertinent part, that an "alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." 8 U.S.C. § 1101(a)(42)(A) provides that, to be a refugee, one must be unable or unwilling to return to, and unable or unwilling to avail himself of the protection of, his home country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. There is no dispute in this case that Petitioner is a person outside the country of his nationality and that he is unwilling to return to that country because of persecution. Respondent has not contested Petitioner's allegation that he is unable or unwilling to avail himself of the protection of the government of Sri Lanka. Petitioner further asserts that he would be persecuted on account of his political opinion. It is this contention with which Respondent disagrees.

■ The standard for withholding of deportation is similar, but it provides less discretion to the Attorney General and imposes a more stringent standard on the alien. 8 U.S.C. § 1253(h)(1) provides that the Attorney General shall not deport any alien if she determines that his "life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." Thus, in order to show eligibility for either asylum or withholding of deportation, Petitioner must show that the persecution he fears if returned to Sri Lanka is "on account of his political opinion."

The United States Supreme Court examined the issue before us now—whether the persecution an alien fears is on account of his political opinion or, on the other hand, on account of his actions or inactions—in *INS v. Elias–Zacarias,* 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). In *Elias–Zacarias,* the respondent was a native of Guatemala who, like Petitioner, conceded his deportability but requested asylum and withholding of deportation. He had testified that when he was 18, two armed, uniformed guerrillas with handkerchiefs covering part of their faces came to his home and asked his parents and him to join with them. They all refused. The guerrillas told them they would be back, and that they should reconsider their decision not to join. The respondent testified that he did not want to join the guerrillas because the guerrillas are against the government and he was afraid that the government would retaliate against him and his family if he joined the guerrillas. *Id.* at 481, 112 S.Ct. at 815. He left Guatemala about two months after the visit from the soldiers, allegedly because he was afraid that they would return. The immigration judge concluded that Elias–Zacarias had failed to demonstrate persecution or a well-founded fear of persecution on account of one of the enumerated grounds. The Board of Immigration Appeals dismissed Elias–Zacarias's appeal on procedural grounds and declined to reopen his deportation hearing so that he could submit new evidence that, following his departure from Guatemala, the guerrillas had twice returned to his family home in continued efforts to recruit him. The Board determined that, even with this new evidence, Elias–Zacarias had failed to make a prima facie showing of eligibility for asylum and had failed to show that the results of his deportation hearing would be changed. The Ninth Circuit reversed, finding that a guerrilla organization's attempt to conscript a person into its military forces necessarily constitutes "persecution on account of ... political opinion," because "the person resisting forced recruitment is expressing a political opinion hostile to the persecutor and because the persecutors' motive in carrying out

the kidnapping is political." *Elias–Zacarias v. INS*, 921 F.2d 844, 850 (1990).

In reviewing the Ninth Circuit's decision, the Supreme Court framed the issue as "whether a guerrilla organization's attempt to coerce a person into performing military service *necessarily* constitutes 'persecution on account of ... political opinion' under § 101(a)(42) of the Immigration and Nationality Act [8 U.S.C. § 1101(a)(42) ]" and concluded that it did not. The Court focused on the factual nature of the inquiry, and emphasized the deference to be accorded to the Board. The Court found that the Board's determination was supported by substantial evidence, noting that even a person who supports a guerrilla movement might resist recruitment because of fear of combat, a desire to remain with his family and friends, and the like. The Court further explained that Elias–Zacarias's professed reason for refusing to join the guerrillas—because he was afraid that the government would retaliate against him and his family if he did so—was not a political motive.

■ An analogy between Elias–Zacarias and Petitioner could certainly be drawn. One might undertake to inform government officials of the names of members of a militant separatist group for reasons other than political opinion, just as one might refuse to join a guerrilla army for reasons other than political differences. Petitioner was, after all, an employee of a state university and a member of a historically scorned ethnic group. Helping the government would presumably improve his position within the university. Like Elias–Zacarias, Petitioner could avoid government retribution by going along with government objectives. Petitioner contrasts his situation to Elias–Zacarias's by arguing that his actions were motivated primarily by his deeply-held political opinion opposing a separate Tamil state. This court does not doubt, and Respondent does not contest, that Petitioner was indeed motivated, at least in part, by his political opinion. However, Petitioner's testimony before the immigration judge indicates motives other than his political opinions are possible. Petitioner testified that when he accepted the job as an instructor at Jaffna University he did not know the situation political situation [sic] in Jaffna, because I was not born and raised in Jaffna....When I went to Jaffna, I could not understand the society. And the chancellor asked me to be assistant student ... of his ... so I accepted to perform that duty.

(Joint Appendix 117–118). Some of Petitioner's comments could be interpreted as saying that he continued to act as an informer because he felt he had to in order to keep his job.

So they [the terrorists] warned us ... for not to get involved in these kind of activities. Having no choice I continued to record incidents to the security forces and also to the university authorities.

(Joint Appendix 118).

They [the terrorists] said if you continue to do that, we will kill you. But having no choice, I had to hold on to my job, I had to report to the university as well security forces.

(Joint Appendix 119). One could conclude that Petitioner's motives were analogous to those of Elias–Zacarias. Of course, the motives of the asylum seeker are relevant only to the extent that they illuminate the motives of the alleged persecutors.

■ The lesson of *Elias–Zacarias* is not that the United States Courts of Appeals should use that case as a yardstick of political motivation. Rather, *Elias–Zacarias* teaches that each case is fact dependent, and the Board's determination should be overturned only where the evidence presented by the petitioner is "so compelling that no reasonable fact finder could fail to find the requisite fear of persecution." *Elias–Zacarias*, 502 U.S. at 484, 112 S.Ct. at 817.

■ The deferential substantial evidence standard makes sense where, as here, the determination hinges on the motivations of the persecutors, who are not before the court, as illuminated by the motivations of the alien. Motivations are easily subject to reinterpretation and characterization upon recollection, and professions that a certain opinion motivated conduct are difficult to refute. Because the credibility of the asylum

seeker is critically important, deference to the Board's determination is appropriate.

█ Petitioner argues that the Board's test—which requires him to show that his persecutors persecuted him because of his political opinion—is "unreasonably constricted and overly burdensome." Petitioner argues that an alien should be afforded more protection—not less—if he acts on his political opinions, thereby incurring retaliation, rather than simply holding them close to his heart and causing no trouble for the opposition. However, this court's obligation is to enforce the law as written, not as it should be written. Congress has enumerated certain attributes which are protected. This list provides protection for individuals who are persecuted on account of their political opinion, but it does not include all individuals who are persecuted because their actions tend to obstruct the activities of politically-motivated organizations, even where those activities may be in part motivated by political opinion. The statute provides protection only where the past or anticipated persecution is on account of political opinion, regardless of whether the persecuted acts on that opinion; we are bound to follow that standard.

The Board's determination that Petitioner's persecution was not on account of his political opinion is supported by substantial evidence. Petitioner testified that he and his colleague were warned by the separatist terrorist organizations "every time we give [sic] names." (Joint Appendix 119). He testified that terrorists threatened him whenever soldiers went after the terrorists, indicating that he had informed the soldiers. "[T]hey thought we [sic] part of this process, we are informing the government, informing the soldiers. So they called us traitors or government informers at that time but we were only trying to protect." (Joint Appendix 122). Equally probative is the fact that Petitioner did not present evidence that the terrorists were targeting anti-separatists who were not serving as government informants; the evidence would support a conclusion, therefore, that it was his status as an informant, not his political opinion, that spurred their hatred. The terrorists focused their efforts on individuals they viewed as "trai-

tors," those who were serving as government informants and thereby causing separatists to be killed by government forces.

For these reasons, the court determines that the Board's decision is supported by substantial evidence, and it shall be affirmed.

## IV.

Because the Board's determination is supported by substantial evidence, its ruling is AFFIRMED.

DAUGHTREY, Circuit Judge, dissenting.

The majority relies on the Supreme Court's recent decision in *INS v. Elias–Zacarias,* 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992), to support its conclusion that the petitioner, a former informant for pro-government Sri Lankan officials, does not have a "well-founded fear of persecution on account of ... political opinion" entitling him to refugee status. Because I conclude that the facts of this case are easily distinguishable from those presented in *Elias–Zacarias,* and because Adhiyappa has shown with compelling evidence that he fears persecution on account of his political opinion, I must dissent.

In *Elias–Zacarias,* a Guatemalan citizen fled his homeland after guerrilla soldiers unsuccessfully tried to draft him into their rebel army. Although the Board of Immigration Appeals denied the petitioner refugee status, the Ninth Circuit reversed, finding that the petitioner had a well-founded fear of persecution based on his expressed political opinion of neutrality toward the guerrilla movement. 921 F.2d 844, 850 (9th Cir.1990). The Supreme Court rejected this reasoning, however, finding insufficient evidence to establish that the guerrillas would persecute the petitioner *because of* that political opinion, rather than because of his refusal to fight with them." 502 U.S. at 483, 112 S.Ct. at 816 (emphasis in original). Although the Court insisted that it was not requiring "direct proof" of the alleged persecutors' motives, it found that to reverse the Board of Immigration Appeals's finding that the petitioner was ineligible for asylum, the petitioner would have to show proof of the alleged persecu-

tor's motive "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution" based on political opinion. *Id.* at 483, 112 S.Ct. at 816. On the facts before it, the Supreme Court believed that the petitioner failed to meet his burden of proving that the guerrillas' motive was to persecute him on account of his political opinion. The Court observed that:

> Even a person who supports a guerrilla movement might resist recruitment for a variety of reasons—fear of combat, a desire to remain with one's family and friends, a desire to earn a better living in civilian life, to mention only a few. The record in the present case not only failed to show a political motive on Elias–Zacharias' part; it showed the opposite. He testified that he refused to joint the guerrillas because he was afraid that the government would retaliate against him and his family if he did so. Nor is there any indication (assuming, *arguendo*, it would suffice) that the guerrillas erroneously *believed* that Elias–Zacharias' refusal was politically based.

*Id.* at 482, 112 S.Ct. at 815–16 (emphasis in original). Thus, the Court found insufficient evidence that the petitioner's refusal to fight was a manifestation of his political opinion, and that his political opinion was targeted for persecution.

In Adhiyappa's case, the Board of Immigration Appeals found that Adhiyappa feared persecution based on his activities as a government informant, not persecution based on his political opinion. The Board stated that "it is reasonable to assume that the retaliation would occur regardless of what political opinion, if any, the respondent held." The majority, too, seems to accept the proposition that Adhiyappa fears persecution based on his political activity, as contrasted to his political opinion. The majority uses *Elias–Zacarias* to support its view. However, the facts of that case and its ultimate holding readily distinguish it from the facts at hand.

*Elias–Zacarias* focused on the burden of proof necessary for a petitioner to show that any alleged persecution is based on the petitioner's political opinion. It demanded "some evidence, direct or circumstantial," of the persecutor's motive and, in a reversal of the Board, proof "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution" based on political opinion. 502 U.S. at 483, 112 S.Ct. at 817. When an asylum-seeker has remained neutral and disassociated with any identifiable political faction, as did Elias–Zacharias, identification of the petitioner's political opinion is difficult. As the Supreme Court acknowledged in *Elias–Zacarias*, one might refuse to join a rebel military group for many reasons; often neutrality does not have a voice. When the petitioner's motive cannot be identified, proof of the persecutor's motive may be even more difficult. In cases involving petitioners who claim persecution based on their neutrality, therefore, the Court indicated that it will not assume that neutrality is a manifestation of a political opinion that is targeted for persecution.

This case, however, differs from those cases involving asylum-seekers who allege persecution based on their neutrality, but who have not displayed a clear political opinion that their persecutors attack. In this case, as the Board acknowledged, Adhiyappa was a member of the Ceylon Workers' Congress, a union which sought to help Indian Tamil Communities and which opposed a separate Tamil state in Sri Lanka. He testified that he and his family had always supported a unified Sri Lanka despite persecution of Indian Tamils by majority Sinhalese. In his position as a university professor, he articulated his anti-separatist politics and was actively engaged in the identification of Tamil terrorists, reporting them to pro-government university officials.

The majority claims that Adhiyappa's motives were unclear and that he may have acted simply to keep his job. Under *Elias–Zacarias*, however, Adhiyappa's motives are irrelevant, *except* as they elucidate the motives of his alleged persecutors. Instead, it is the motives of the alleged persecutors that are pertinent. And here, the Tamil separatists made clear their intent to kill any who actively opposed their separatist movement by informing on them. The majority insists that 8 U.S.C. § 1101(a)(42)(A) gives refugee status to "individuals who are persecuted on

account of their political opinion, but it does not include all individuals who are persecuted because their actions tend to obstruct the activities of politically-motivated organizations, even where those activities may be in part motivated by political opinion." But, it is difficult to see how persecutors can identify targets of persecution based on political opinion, except through political expression and activity. Unlike race, political opinion is perceived only by its expression. Thus, when acts such as those of Adhiyappa so clearly express a political opinion, persecution on account of those actions *is* persecution on account of political opinion.

Other cases reflect this reasoning. In a case decided after *Elias–Zacarias*, the Second Circuit reversed the Board of Immigration Appeals's denial of refugee status to a Peruvian petitioner who had been a member of a municipal governing body and had spoken out against the "Shining Path," a communist guerrilla organization. *Sotelo–Aquije v. Slattery*, 17 F.3d 33 (2d Cir.1994). As a result of his activity, the Shining Path had threatened to kill the petitioner unless he resigned his government position. The petitioner sought asylum in the United States, but the Board denied refugee status, reasoning that the Shining Path had threatened the petitioner because of his political position, not his political beliefs. The Second Circuit rejected that reasoning, insisting that the applicant "had a well-founded fear of persecution on account of his acts and expressions of political opposition to the Shining Path," *id.* at 37, given the fact that he had spoken out against the Shining Path and that only municipal leaders who opposed the Shining Path had been threatened with violence. With obvious evidence that the petitioner's expressions of political opinion had prompted reprisals, the court found the applicant eligible for asylum.

Similarly, in *Turcios v. INS,* 821 F.2d 1396 (9th Cir.1987), an El Salvadoran citizen requested asylum, claiming that he feared persecution based on his political opinion. The petitioner testified that after the government police saw him talking with a leftist university professor, the petitioner was kidnapped, imprisoned, and tortured because the police

believed that he was involved with guerrilla politics. After his release, the petitioner illegally entered the United States, fearing further persecution. The Ninth Circuit interpreted the applicant's assertions of neutrality as expressions of a political opinion which had prompted government persecution. *Id.* at 1401. Since the date of that opinion, *Elias–Zacarias* has questioned whether a petitioner can prove persecution based on political opinion by asserting neutrality as the political opinion prompting reprisal. However, in *Turcios,* the petitioner's activities were more than mere manifestations of neutrality. Noting that Turcios had overtly discussed the government's intervention in university affairs with a leftist professor, and had demonstrated publicly, the court stated that "Turcios's actions constituted an expression of political opinion." *Id.* It concluded that "[p]ersecution because of an overt manifestation of a political opinion is persecution because of a political opinion." *Id.* The level of proof in *Turcios,* I would submit, should easily satisfy the requirements of *Elias–Zacarias.*

The facts of this case are more analogous to *Turcios* and *Sotelo–Aquije* than to *Elias–Zacarias.* Adhiyappa clearly expressed a political opinion by informing on Tamil terrorists. The Tamil terrorists clearly expressed their intent to kill him if he did not cease his political activity. Certainly the fact that a close colleague was killed upon his return to Sri Lanka illustrates with compelling clarity that the separatists seek to persecute those who actively oppose a separate state.

*Elias–Zacarias* demands that in order to reverse the Board's denial of refugee status, a petitioner for asylum must present compelling proof that the alleged persecutors seek to harm the petitioner because of his political opinion. Because I believe that the petitioner in this case has met this standard of proof, I respectfully dissent from the majority's conclusion that he should be denied asylum.