Ferdinand HAMMER, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 98–4339.

United States Court of Appeals, Sixth Circuit.

Argued: Sept. 15, 1999.

Decided and Filed: Nov. 8, 1999.

William E. Bufalino II (argued and briefed), Bufalino & Palazzolo, Clinton Township, Michigan, for Petitioner.

Jeffrey L. Menkin (argued and briefed), Lisa Newell (briefed), U.S. Department of Justice, Special Investigations, Criminal Division, Washington, D.C., for Respondent.

Before: BATCHELDER and GILMAN, Circuit Judges; HOOD,* District Judge.

## OPINION

GILMAN, Circuit Judge.

Ferdinand Hammer, a 78–year–old resident of Michigan, complains that he is about to be deported to a country that he has not seen in more than half a century on the basis of conduct that he claims is wrongly attributed to him. In response, the government charges that in his youth Hammer was an active participant in Hitler's "final solution." There is no question that Hammer served as a member of the SS in the army of Nazi Germany during World War II. After the war, he entered the United States and became an American citizen. In 1994, the government commenced denaturalization proceedings against him in the United States District Court for the Eastern District of Michigan, alleging that he had concealed from the immigration authorities the fact that he had served as an armed SS guard at the Auschwitz and Sachsenhausen concentration camps and on prisoner rail transports between concentration camps.

The district court ordered that Hammer be denaturalized, an order from which Hammer did not appeal. Following the denaturalization decision, the government began this deportation action against Hammer in an administrative proceeding brought before the immigration court. The immigration judge concluded that Hammer should be deported, and the Board of Immigration Appeals (BIA) dismissed Hammer's appeal. For the reasons set forth below, we **DENY** Hammer's petition for review.

* The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

## I. BACKGROUND

It is undisputed that Hammer is an ethnic German, born in Lacarak, Croatia, who served as a member of the SS in the army of Nazi Germany. He came to the United States and was naturalized as a citizen in 1963. Beyond these bare facts, however, the parties do not agree. The government claims that Hammer was an armed SS prison guard at the notorious Auschwitz concentration camp, where over one million Jews, Gypsies, Christian clergy, and other opponents of the Nazi regime lost their lives. It further claims that he served as an armed guard at the Sachsenhausen concentration camp, and on prisoner transport trains between the Auschwitz, Sachsenhausen, and Mauthausen concentration camps.

In 1994, the government commenced a denaturalization proceeding against Hammer. The gravamen of the government's complaint was that Hammer had illegally obtained United States citizenship by concealing the fact that he had served in the notorious "Death's Head Battalion" (Totenkopfverbaende) of the Nazi Waffen–SS. Hammer, in contrast, claimed that he had served in an SS combat unit known as the Wiking Division which saw action on the Russian front. In its June 1996 order, the district court specifically found Hammer's testimony incredible. The district court concluded that Hammer had procured his United States citizenship by willful, material misrepresentation and concealment of his service as an armed concentration camp guard and prisoner escort. It ordered his certificate of naturalization revoked. Hammer did not appeal.

In October of 1996, the government began deportation proceedings against Hammer. It charged that Hammer was deportable pursuant to the Holtzman Amendment, 8 U.S.C. § 1182(a)(3)(E). The Holtzman Amendment renders ineligible for entry into the United States any alien who assisted or otherwise participated in the persecution of persons because of race, religion, national origin, or political opinion under the direction of, or in association with, the Nazi government of Germany. A corresponding statutory section, 8 U.S.C. § 1227(a)(4)(D), authorizes the government to deport such aliens. The immigration judge held a hearing on March 17, 1997, during which the government introduced over 2,000 pages of exhibits, including the bulk of the evidence that it had presented at the denaturalization proceeding. Hammer presented two witnesses who had briefly known him in Europe, gave his own testimony, and introduced an unauthenticated document stating that ethnic Germans in Croatia were automatically drafted into the Waffen–SS.

In an opinion dated April 24, 1997, the immigration judge held that the doctrine of collateral estoppel barred Hammer from relitigating issues relating to his date of birth, wartime service, and the conditions at the concentration camps where he served. The immigration judge also conducted an independent review of the evidence submitted at the denaturalization proceeding, concluding that the government had proven by unequivocal, clear, and convincing evidence that Hammer had assisted in persecutions on the basis of race, religion, national origin, or political opinion. Accordingly, the immigration judge held that Hammer was subject to deportation pursuant to the Holtzman Amendment. He found Hammer's testimony to be inconsistent and incredible, just as the district court had. (Among other things, Hammer could not recall the name of the SS Wiking Division officer under whom he had supposedly served or the name of a single battle in which he had supposedly fought.)

Hammer was ordered deported to Croatia, although the Croatian embassy subsequently advised the government that Croatia would not accept him. The deportation order was thereafter amended to state that Austria was the country to which Hammer was to be deported. He timely appealed to the BIA, which dismissed

Hammer's appeal. This petition for review followed.

## II. ANALYSIS

### A. Standard of review

■ The BIA's factual determinations are subject to the substantial evidence standard of review. "All the substantial evidence standard requires is that the BIA's conclusion, based on the evidence presented, be substantially reasonable." *See Klawitter v. INS*, 970 F.2d 149, 151 (6th Cir.1992) (internal quotation marks and citation omitted). "Substantial evidence is thus a deferential standard which plainly does not entitle a reviewing court to reverse ... simply because it is convinced that it would have decided the case differently ... [I]n order to reverse the BIA's factual determinations, the reviewing court must find that the evidence not only supports a contrary conclusion, but indeed compels it." *Adhiyappa v. INS*, 58 F.3d 261, 265 (6th Cir.1995) (internal quotation marks and citation omitted). Legal questions are reviewed de novo. *See id.*

### B. Collateral estoppel

■ Hammer claims that the BIA incorrectly applied the doctrine of collateral estoppel to the district court's factual findings in the denaturalization proceeding. Although he does not explicitly say so, it appears that Hammer seeks another hearing so that he may contest the facts in question.

■ The availability of collateral estoppel is a mixed question of law and fact which this court reviews de novo. *See United States v. Sandoz Pharm. Corp.*, 894 F.2d 825, 826 (6th Cir.1990). Under the doctrine of collateral estoppel, which is also referred to as issue preclusion, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S.

147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). The doctrine reflects the longstanding policy that one full opportunity to litigate an issue is sufficient. *See Hickman v. Commissioner*, 183 F.3d 535, 537 (6th Cir.1999).

■ Although the requirements for collateral estoppel are enumerated differently in different opinions, this court has recently stated that the doctrine applies only when (1) the issue in the subsequent litigation is identical to that resolved in the earlier litigation, (2) the issue was actually litigated and decided in the prior action, (3) the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation, (4) the party to be estopped was a party to the prior litigation (or in privity with such a party), and (5) the party to be estopped had a full and fair opportunity to litigate the issue. *See United States v. Real Property Known and Numbered as 415 E. Mitchell Ave.*, 149 F.3d 472, 476 (6th Cir.1998); Bills v. Aseltine, 52 F.3d 596, 604 (6th Cir.1995).

As a preliminary matter, we must determine exactly what facts were deemed established by operation of the collateral estoppel doctrine. The district court made twelve findings of fact in the denaturalization proceeding. Although Hammer and the government do not agree on which of those facts were deemed established by collateral estoppel, the immigration judge's order states that only four facts were so established for the purposes of the deportation proceeding. Those facts were as follows:

(1) [Hammer] was born on July 30, 1921;

(2) [Hammer] had the rank of "Sturmmann" [roughly equivalent to a lance corporal] and served during World War II, as an armed Waffen–SS Death's Head Battalion guard at the Auschwitz and Sachsenhausen concentration camps established and operated by the Nazi government of Germany;

(3) [Hammer] served as an armed Waffen–SS Death's Head Battalion (SS–Totenkopfverbaende) guard for prisoner transports between Auschwitz and Sachsenhausen concentration camps, and prisoner transport between Sachsenhausen and Mauthausen concentration camps;

(4) During [Hammer's] service as an armed Waffen–SS Death's Head Battalion guard at the Auschwitz, Sachsenhausen, and Mauthausen concentration camps, "horrible mistreatment was meted out to inmates of those camps."

Notwithstanding the parties' arguments to the contrary, the immigration judge held that those four facts were the only ones established by collateral estoppel. We agree.

### 1. Identical issues

There is no question that the above issues are identical to those that were in dispute at the denaturalization proceeding. Hammer argues, however, that the government was required to prove certain elements in the deportation proceeding that it was not required to prove in the denaturalization proceeding. He therefore reasons that the "issues litigated" were not identical and collateral estoppel does not apply.

We find this argument to be without merit. As noted above, the only findings that the doctrine of collateral estoppel precluded him from contesting were the four findings outlined above (i.e., his date of birth, his service as a concentration camp guard, his service as a prisoner transport guard, and the fact that inmates at the Auschwitz, Sachsenhausen, and Mauthausen concentration camps were horribly mistreated). Although Hammer points out the absence of eyewitness testimony that he had personally engaged in persecution, the immigration judge did not assume that the district court had found that Hammer had personally participated in wartime atrocities (at least beyond the atrocities in which an armed concentration camp guard necessarily would have participated or assisted simply by virtue of being an armed concentration camp guard). The district court was not required to make, and in fact did not make, any such finding. In order to denaturalize Hammer, the district court had only to find that he obtained his United States citizenship through concealment of a material fact or by a willful, material misrepresentation. Hammer's argument is more properly understood as one regarding the sufficiency of the evidence presented, and is therefore discussed in Part C below.

### 2. Actually litigated and decided

The issues of when Hammer was born, where and when he served, and what happened at the concentration camps in question were extensively litigated in the denaturalization proceeding in the district court. There, the government presented documentary evidence showing that Hammer was an armed SS guard at Auschwitz and Sachsenhausen, and served as a guard on prisoner rail transports between Nazi concentration camps. Included in this evidence were Nazi-regime documents identifying Hammer by name, rank, and date of birth. The government also presented the testimony of an expert witness and two Auschwitz survivors to prove the nature of the concentration camp.

In the district court's opinion and order, it specifically found that Hammer was born on July 30, 1921, that he served in the Death's Head Battalion of the Waffen–SS at Auschwitz and Sachsenhausen concentration camps, and that while Hammer was a guard there, "horrible mistreatment was meted out to inmates of these camps." The four factual findings were thus actually litigated and decided in the denaturalization proceeding.

### 3. Necessary and essential to a judgment on the merits

The key legal question in the denaturalization proceeding was whether Hammer had procured his citizenship through the

concealment of a material fact or by willful, material misrepresentation. *See* 8 U.S.C. § 1451. In Hammer's case, the material facts were where he served during the war and when he was there. The first three findings established by collateral estoppel directly relate to these material facts.

Hammer testified that he was a soldier on the Russian front, but the government's evidence established that he was actually an SS concentration camp and prisoner transport guard. The location and duration of Hammer's Nazi service were clearly "necessary and essential" to the denaturalization proceeding. Hammer's birth date was also necessary and essential. As part of demonstrating that Hammer had materially misrepresented the nature of his involvement with the Nazis, the government also had to prove his birth date, by which he was identified in Nazi documents along with his name and rank. The first three findings were thus necessary and essential to a judgment on the merits.

As to the final finding—that the conditions of Nazi concentration camps were horrible—the government contends that this fact was "essential to the court's finding that Hammer's misrepresentations of his guard service were material to the decision to grant Hammer citizenship." Hammer has not challenged this finding, presumably because his defense is based on his contention that he served in an SS combat unit, not as a concentration camp guard.

#### 4. Hammer was a party to the prior litigation

Hammer necessarily concedes that he was a party to the prior litigation.

#### 5. Hammer had a full and fair opportunity to litigate the issues

Hammer states in his brief that he was denied a full and fair opportunity to litigate the issues, but does not identify any specific deficiency in the proceedings. To the contrary, the record reflects that the district court provided Hammer a hearing that comported with all of the standards of due process.

■ All five collateral estoppel factors having been satisfied, we conclude that the BIA did not err in affirming the immigration judge's application of the doctrine of collateral estoppel. We also note that even without the benefit of collateral estoppel, the evidence that the government presented at Hammer's deportation hearing, and which the immigration judge independently reviewed, was more than sufficient for the BIA to have reached a substantially reasonable decision to deport Hammer. The government introduced into evidence properly authenticated wartime concentration camp guard rosters that identified Hammer as an SS Death's Head Battalion guard at the Auschwitz and Sachsenhausen concentration camps, and as a guard on prisoner transports between the Auschwitz and Sachsenhausen camps and between the Sachsenhausen and Malthausen camps. In addition, the government introduced a properly authenticated document prepared in 1945 by the United States Army, which was based on a review of seized SS records, and which identified Hammer by name, rank, date, and place of birth as a member of the 1st Company of the SS Death's Head Battalion at the Auschwitz concentration camp.

#### C. Direct evidence of persecution

■ Hammer claims that the government failed to prove that he is deportable under the Holtzman Amendment. His primary point is that the government did not prove that he personally engaged in "persecution" as defined by the Amendment.

The Holtzman Amendment provides as follows:

Any alien who, during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with—

(I) the Nazi government of Germany,

(II) any government in any area occupied by the military forces of the Nazi government of Germany,

(III) any government established with the assistance or cooperation of the Nazi government of Germany, or

(IV) any government which was an ally of the Nazi government of Germany, ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion is inadmissible.

8 U.S.C. § 1182(a)(3)(E).

 Hammer argues that the government failed to meet its burden of proving that he "ordered, incited, assisted, or otherwise participated in ... persecution" because it did not present "specific evidence of persecution by the Petitioner against the prisoners or that, as a guard, he engaged in acts of brutality against them." The government, however, need not present evidence of personal involvement in specific atrocities under the Holtzman Amendment. As the Seventh Circuit has observed:

> Because the statute authorizes deportation of anyone who "assisted" in persecution, personal involvement in atrocities need not be proven. [A]n individual who served as a guard has assisted in persecution for purposes of [the Holtzman Amendment].... Nazi concentration camps were places of persecution; individuals who, armed with guns, held the prisoners captive and prodded them into forced labor with threats of death or capital punishment cannot deny that they aided the Nazis in their program of racial, political and religious oppression.

*Kulle v. INS*, 825 F.2d 1188, 1192 (7th Cir.1987) (first set of brackets in original). *See also Kairys v. INS*, 981 F.2d 937, 942–43 (7th Cir.1992) (holding that an alien's service as an armed SS guard at a labor camp attached to the Treblinka concentration camp rendered the alien deportable

under the Holtzman Amendment for having "assisted" in Nazi persecution "whether or not he committed a specific atrocity by beating a Jewish inmate to death or otherwise mistreating him beyond what is implicit in serving as a guard at such a camp ... "). As Judge Posner explained in *Kairys*:

> If the operation of such a camp were treated as an ordinary criminal conspiracy, the armed guards, like the lookouts for a gang of robbers, would be deemed coconspirators, or if not, certainly aiders and abettors of the conspiracy; and no more should be required to satisfy the noncriminal provision of the Holtzman Amendment that makes assisting in persecution a ground for deportation.

*Id.* at 943.

 We find the reasoning in both *Kulle* and *Kairys* to be persuasive. The facts presented by the government show that Hammer served as an armed SS guard at Auschwitz and Sachsenhausen, and on prisoner rail transports. As a guard, Hammer had standing orders to shoot anyone who attempted to escape. Although Hammer correctly observes that the government produced no evidence that Hammer actually shot anyone or forced any prisoner into a gas chamber, no court has required such a showing. Over one million people were murdered based solely on their religion or ethnicity at the concentration camps where Hammer stood guard. Hammer's interpretation of the Holtzman Amendment would read the words "assisted, or otherwise participated" out of the statute. We conclude that the requirements of the Holtzman Amendment may be satisfied even in the absence of eyewitness testimony that the alien personally engaged in acts of brutality.

The cases most strongly supporting Hammer's position are *Laipenieks v. INS*, 750 F.2d 1427 (9th Cir.1985), and *United States v. Sprogis*, 763 F.2d 115 (2d Cir. 1985), both of which involved aliens who served as Latvian police officers during the time that Latvia was occupied by Nazi

Germany. To the extent that those cases would require the government to prove the alien's personal participation or active assistance in specific acts of brutality, *see Laipenieks*, 750 F.2d at 1431; *see also Sprogis*, 763 F.2d at 122, we decline to follow them. *Compare United States v. Kairys*, 782 F.2d 1374, 1377 n. 3 (7th Cir. 1986) (concluding that service as an armed concentration camp or labor camp guard as a matter of law equals persecution of civilians within the meaning of the Displaced Persons Act); *Schellong v. INS*, 805 F.2d 655, 661 (7th Cir.1986) (rejecting *Laipenieks* and *Sprogis* as inconsistent with *Fedorenko v. United States*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), and specifically distinguishing the two cases as involving local police officers rather than SS concentration camp guards).

We also note that in *Petkiewytsch v. INS*, 945 F.2d 871 (6th Cir.1991), a case involving a civilian forced laborer who had served under duress as a labor education camp guard, this court suggested that the Holtzman Amendment might require something more than "assistance," even though the word "assisted" appears directly in the statute. *See id.* at 880 (stating that the Holtzman Amendment "appears to require active participation in persecution going beyond 'assistance.'"). Hammer does not place great reliance on *Petkiewytsch*, and for good reason. The BIA found that he served willingly as an armed SS concentration camp guard. This is materially different than a prisoner serving under duress as a civilian guard at a labor education camp. Hammer, in fact, never claimed in the proceedings below that he served involuntarily as a concentration camp guard. Furthermore, the BIA found that the SS had no legal authority to conscript an ethnic German in Croatia, and even the unauthenticated document relied upon by Hammer refers only to the induction, and not conscription, of ethnic Germans.

*Petkiewytsch* thus appears to stand for the proposition that some forms of "assistance" to the Nazi regime (such as membership, without more, in an organization

which cooperated with the Nazis) may be too attenuated to be considered "under the direction of, or in association with" the Nazi government, and thus insufficient to trigger deportation under the Holtzman Amendment. We do not believe that *Petkiewytsch* compels the conclusion that "assistance" to the Nazi regime can never be sufficient for deportation under the Holtzman Amendment, because such an interpretation would be squarely at odds with the text of the statute. In any event, even if Hammer did not "assist[ ]" in persecution, he certainly "otherwise participated" in it. Indeed, in *Petkiewytsch*, this court took pains to distinguish labor education camps and those required to serve involuntarily as civilian guards at such camps from "extermination camps such as Auschwitz," *Petkiewytsch*, 945 F.2d at 873–74 (emphasis added), and the SS guards who controlled them.

We thus conclude that the BIA's dismissal of Hammer's appeal was substantially reasonable.

**D. Special and affirmative defenses**

Finally, Hammer claims that the BIA erred in disregarding his "special and affirmative defenses." Hammer apparently refers to a series of claims made before the immigration judge that his deportation is barred by (1) the statute of limitations, (2) the doctrine of laches and estoppel, (3) waiver, and (4) the doctrine of unclean hands. In contrast, his brief on appeal discusses the constitutional prohibition against Bills of Attainder, the problems of stale evidence, and the requirements of due process under the Fifth Amendment, with references to suggestive identifications and the problems of relying on evidence from the Soviet Union. He also argues that the immigration judge's failure to rule on his "special and affirmative defenses" before the hearing deprived him of due process because he was put at "a great disadvantage."

Hammer's argument that the immigration judge erred in deferring a ruling on his defenses until after the hearing is

meritless. Indeed, it appears that the decision *preserved* Hammer's due process rights by affording him the benefit of oral argument on his purported defenses. In any event, Hammer did not object during the proceedings below to the immigration judge's failure to rule on the defenses before the hearing, and has thus failed to preserve the issue for appeal.

██ The defenses themselves, many of which have no conceivable application to this case, indicate that they were simply culled from briefs originally prepared.in another case. Hammer, for example, objects to "photographic displays" and "highly suggestive" eyewitness identifications, even though no photographs were admitted into evidence and the government did not call any eyewitnesses to identify Hammer. He also argues that the witnesses were elderly and had memory problems, even though, again, the government offered no eyewitness testimony concerning his behavior. The only eyewitness testimony in this case involved the general mistreatment that occurred at Auschwitz, an issue which cannot seriously be disputed and which Hammer in fact does not dispute.

██ The only "defense" that has any semblance of merit—that the Holtzman Amendment is a Bill of Attainder—was not raised below and thus has not been preserved for appeal. Even if it had been preserved, however, the argument has been rejected by every court that has considered it. *See Schellong v. INS*, 805 F.2d 655, 662 (7th Cir.1986); *Linnas v. INS*, 790 F.2d 1024, 1029–30 (2d Cir.1986); *Artukovic v. INS*, 693 F.2d 894, 897 (9th Cir.1982). In short, we find that Hammer's "special and affirmative defenses" are devoid of merit.

## III. CONCLUSION

For all of the reasons set forth above, the petition for review is **DENIED**.