# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-4040

MUHAMMED IQBAL MOHIDEEN, et al.,

*Petitioners,*

v.

ALBERTO R. GONZALES,[*]
Attorney General of the United States,

*Respondent.*

_____

Petition for Review of an Order of
the Board of Immigration Appeals.
Nos. A79-273-352, A79-273-353, A79-273-354,
A79-273-355, A79-273-356 & A79-273-357

_____

ARGUED MARCH 2, 2005—DECIDED JULY 21, 2005

_____

Before BAUER, EASTERBROOK, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Muhammed Mohideen, a native
and citizen of Sri Lanka, petitioned for asylum on the basis
of his religion, Islam, and his nationality, which he de-
scribes as Sri Lankan Moor. His wife and children have

_____

[*] Pursuant to FED. R. APP. P. 43(c), we have substituted Alberto
Gonzales for John Ashcroft as the named respondent.

derivative claims. Mohideen fears persecution by the Liberation Tigers of Tamil Elam ("LTTE"), a militant group in Sri Lanka that seeks to establish a separate Tamil state. The immigration judge ("IJ") found Mohideen credible but denied his claim, concluding that he was being targeted by the LTTE based on his wealth, not his religion or nationality. Mohideen argued to the Board of Immigration Appeals ("BIA") that the IJ failed to consider evidence that his persecutors had a "mixed motive" for persecuting him. The BIA upheld the IJ's conclusion that Mohideen had not shown that the LTTE was motivated by anything other than his wealth. On his petition for review in this court, Mohideen abandons his argument that the LTTE targeted him based on his nationality and presses only his contention that he was targeted based in part on his religion. He argues that the BIA ignored evidence in the record that the LTTE targeted him because he was a Muslim. Because we agree that the BIA failed to consider critical evidence that supported Mohideen's "mixed motive" claim, we grant the petition for review and remand for further proceedings.

Sri Lanka, Mohideen's native country, is populated predominantly by Sinhalese, Tamils, and Sri Lankan Moors. *See* United Nations Commissioner for Refugees, *Background Paper on Refugees and Asylum Seekers from Sri Lanka* (June 2001). The Sinhalese, who are mostly Buddhist, comprise the majority of the population, control the government, and live concentrated in the southwestern region of the country where Mohideen's family lives. *See* U.S. State Department, *Sri Lanka: Comments on Country Conditions and Asylum Claims* (1995); U.S. State Department, *Background Note: Sri Lanka* (Sept. 2004) *available at* http://www.state.gov/r/pa/ei/bgn/5249.htm (hereinafter State Department 2004 Background Note); *see also Adhiyappa v. INS*, 58 F.3d 261, 263 (6th Cir. 1995). Tamils, who are mainly Hindu, make up 18% of the population. *See* State Department 2004 Background Note. As a Muslim and

Sri Lankan Moor, Mohideen is part of a small minority group comprising only 7% of the population. Mohideen and his family lived on the southwestern coast of Sri Lanka in Wellawatte, a small area in the country's capital, Colombo. Colombo is populated primarily by Sinhalese, but Tamils and Muslims also live there.

Beginning in the 1970s, Tamil politicians began to push for an independent Tamil state in northern and eastern Sri Lanka, areas that are populated predominantly by Tamils. *Id.* The LTTE is a guerrilla group that uses force and intimidation to push for a separate Tamil state. *See* U.S. State Department, *Sri Lanka—Country Reports on Human Rights Practices 2000* (Feb. 2001). The LTTE is responsible for serious human rights abuses, including killings, arbitrary detention, extortion, and the forced recruitment of children to be soldiers. *Id.* Fighting between the LTTE and the Sri Lankan government has displaced hundreds of thousands of citizens. In 1983 the LTTE killed 13 Sinhalese soldiers; although only a small portion of the Tamil population belongs to the LTTE, the killings prompted a backlash from the Sinhalese government against the larger Tamil population. Hundreds of Tamils were killed and tens of thousands were left homeless. *Id.* Mohideen testified that all of the Tamils living in his neighborhood were driven from their homes during the government's backlash. India intervened on behalf of the Tamils in 1987, leading to the Indo-Sri Lankan peace accord, in which the Sri Lankan government granted some concessions to the Tamil population. *Id.* Since the peace accord, Tamils have slowly been repopulating Colombo, but it was not clear from Mohideen's testimony whether any Tamils had reestablished themselves in his neighborhood by the time he fled the country. When asked at his asylum hearing why the 1980s backlash was important to his claim, Mohideen explained: "I want to tell you as to why the

Tamils hated us, and as to why they are also started coming there and living, and then they started targeting the Muslims, the reasons."

The country reports provide some support for Mohideen's testimony. They describe how the LTTE responded to the 1980s backlash—which had been engineered by the Sinhalese-controlled government—with violence focused on the Muslim population living in the north of the country. In 1990 the LTTE "expelled some 46,000 Muslim inhabitants from their homes[,] . . . virtually the entire Muslim population." *Id.* The report also says that "[i]n the past, the LTTE expropriated Muslim homes, lands, and businesses and threatened Muslim families with death if they attempt to return." *Id.*

Mohideen's claim is premised upon his fear of persecution by the LTTE. *See Balogun v. Ashcroft,* 374 F.3d 492, 499 n.8 (7th Cir. 2004) (fear of persecution by a group that the government is unable or unwilling to control may qualify as persecution for purposes of an asylum claim).[1] He offered evidence that his family has been harassed by Tamils in the past and that before he fled Sri Lanka, the LTTE tried to extort money from him by threatening to kill him and his family. The events leading up to the extortion began in 1998 when Mohideen decided to demolish and remodel a portion of his home in Wellawatte to create extra rooms to rent out. While the building was still under construction, Tamils from the north—possibly ones who had been driven from their homes a decade earlier—asked him if they could rent the property when it was finished. It is not clear from

---

[1] The Attorney General does not argue that Mohideen's claim asserts only private persecution associated with general civil strife rather than persecution by the government or a nongovernmental group with the government's acquiescence. Neither the IJ nor the BIA addressed this point.

the record whether these Tamils were connected with the LTTE. Mohideen refused to rent to them because he didn't want to rent his property to Tamils and because the police had warned people in his town not to rent to Tamils. As a result "different other boys" came to harass his workers. Mohideen testified that "they used to harass, started shouting at us saying that we were rich Muslims and, you know, we are doing smuggling and all sort of things and all, and in a way they came to interrupt me, my site." Tamil men also began to harass his mother-in-law as she picked his children up from school.

Mohideen was unable to continue construction on his house because the harassment caused his workers to quit. In June 1999 he sold a portion of the property to a Sinhalese buyer and moved his family to a town about thirty minutes away. Mohideen testified that he did not think the Sinhalese buyer had similar troubles with the Tamils because Tamils did not generally target the more powerful Sinhalese people. Mohideen admitted, however, that he did not maintain contact with the buyer, so he is not sure whether he actually did remain free of harassment.

Mohideen's parents, who lived with him, had trouble adjusting to the new neighborhood; Mohideen's business suffered because his customers would not travel to him. He and his parents moved back to Wellawatte into the portion of his property that he had retained. Mohideen testified that immediately after his return he began receiving calls demanding that he give 3,000,000 rupees (approximately $38,500) to the LTTE. The callers told Mohideen that they knew his new location and would kill him and his family if he did not pay. Mohideen reported the incident to the police, who initially told him they could not help him. Eventually the police told him to record his phone conversations, and Mohideen was able to record one call. The translated transcript confirms that someone was demanding money from Mohideen by the "end of the sixth month."

On one occasion an LTTE member approached Mohideen's oldest son at school and threatened to kill the family if Mohideen did not pay the LTTE money. When asked how he knew the man who approached his son was with the LTTE, Mohideen responded, "[T]hey told him that they were from the LTTE." Mohideen testified that the threat to his son convinced him to flee Sri Lanka. The government suggests that he actually decided earlier to move, but Mohideen testified repeatedly and consistently that until his son was threatened, he always intended to stay in Sri Lanka. Mohideen and his family stayed at a friend's house for a short time preparing to leave the country. He did not go back to his home again, but his father, who was there, told him that men from the LTTE came looking for Mohideen twice right before the money was due. On one of those occasions, the men beat up his father.

Both the IJ and the BIA concluded that Mohideen was targeted for extortion solely based on his wealth, and both said that the background country reports did not help his case because they indicated widespread abuse by the LTTE against all nationalities and religions. In his petition for review, Mohideen argues that the BIA misapplied the law of mixed motives to his case and failed to consider evidence in the record that he was persecuted on account of his religion.

Several other circuits have formally adopted the doctrine of "mixed motives," which recognizes that an individual may qualify for asylum if his or her persecutors have more than one motive as long as one of the motives is specified in the Immigration and Nationality Act ("INA"). *See Osorio v. INS*, 18 F.3d 1017, 1028 (2d Cir. 1994); *see also De Brenner v. Ashcroft*, 388 F.3d 629, 636 (8th Cir. 2004); *Lopez-Soto v. Ashcroft*, 383 F.3d 228, 236 (4th Cir. 2004); *Girma v. INS*, 283 F.3d 664, 667 (5th Cir. 2002); *Borja v. INS*, 175 F.3d 732, 735-36 (9th Cir. 1999); *Chang v. INS*, 119 F.3d 1055, 1065 (3d Cir. 1997). The asylum statute defines a refugee as

a person who is unable or unwilling to return to his country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). We agree with our sister circuits that the statute's reference to persecution "on account of" one of the specified grounds does not mean persecution *solely* on account of one of those grounds.

Here, the BIA cited the doctrine of mixed motives with approval but did not evaluate the evidence of dual motive that Mohideen had presented. In particular, Mohideen offered evidence that he and his family have been harassed by Tamils in the past while they were on their way to their mosque to pray. He also testified that rich Sinhalese people are not targeted for extortion the way Muslims are targeted. Furthermore, he testified that when the Tamil men first began to harass him at his house, they called him a "rich Muslim." Finally, the country reports corroborate Mohideen's claim, at least to the extent that they describe how the LTTE has targeted Muslims in the past, seemingly without regard to their wealth. As we have noted, the country reports recount that in 1990 the LTTE evicted nearly the entire Muslim population that was living in the north of the country. There is no suggestion that the LTTE evicted only wealthy Muslims from their homes or evicted everyone in an area that happened to include some Muslims. Mohideen's testimony was found to be credible, and the State Department's country reports provide some support for his claim that the LTTE selects its victims at least in part on the basis of their religion.

Although the BIA may have some reason for discounting the foregoing record evidence, it is not sufficient simply to ignore it when announcing a conclusion. *See Tolosa v. Ashcroft*, 384 F.3d 906, 909-10 (7th Cir. 2004) (discussing IJ's failure to discuss key evidence); *Lian v. Ashcroft*, 379 F.3d 457, 461 (7th Cir. 2004) (same). Mohideen is entitled

to a reasoned analysis that engages the evidence he presented, *see Lian*, 379 F.3d at 461, specifically the evidence regarding the "mixed motive" aspect of his claim. Accordingly, we GRANT the petition for review, VACATE the order of removal, and REMAND for further proceedings.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—7-21-05