Agron NELI; Ariana Neli, Petitioners,

v.

John ASHCROFT, Attorney General, and Immigration and Naturalization Service, Respondents.

No. 02–3749.

United States Court of Appeals, Sixth Circuit.

Dec. 18, 2003.

John Gerard Chupa, Law Offices of John Chupa & Associates, Farmington Hills, MI, for Petitioners.

Richard M. Evans, Emily A. Radford, David E. Dauenheimer, U.S. Department of Justice, Office of Litigation, Washington, DC, for Respondents.

Before CLAY and COOK, Circuit Judges; and STAFFORD, District Judge.*

STAFFORD, District Judge.

Agron Neli and his wife, Ariana (collectively, "Petitioners"), seek review of a decision of the Board of Immigration Appeals that affirms, without opinion, the order of the immigration judge denying their request for asylum and withholding of deportation. We remand for further consideration and findings.

## I. BACKGROUND

Agron Neli ("Agron") was born and raised in Albania, the son of a wealthy family. In 1944, sixteen years before Agron's birth, the Communists took control of Albania. According to Agron, the Communists thereafter began persecuting his family in part because of his family's well-known associations and activities in the anti-Communist movement in Albania and in part because of his grandfather's status as a United States citizen. Among other things, the Neli family property was confiscated; Agron's grandfather was arrested and imprisoned for life; his uncle was executed; his father was put under house-arrest at the age of ten; and several members of his mother's family were murdered. Agron himself was forced into menial labor, first as a child, then as a young adult "slave" in the military, and finally as an adult coal miner. J.A. 312.[1]

According to Agron, he was arrested and severely beaten on various occasions. For example, in 1989, he was arrested after he spoke out about the poor working conditions at the mine where he was forced to work. While he was detained, the police kicked him, punched him with

---

* The Honorable William Stafford, Senior United States District Judge for the Northern District of Florida, sitting designation.

1. References to J.A. refer to the Joint Appendix.

their fists, and beat him with their batons. In February of 1991, after he organized and participated in an anti-government demonstration, he was held for three weeks in a cell where he was beaten every day on every part of his bloodied body. When he was released, his body was a mass of bruises and he was missing all of his front teeth. His injuries left him bed-ridden for a week following his release. In 1992, after he criticized a law limiting the rights of independent journalists, Agron was told that his "life could be turned into hell." J.A. 314. Thereafter, Agron was repeatedly threatened, and he was followed in every step of his life. In 1995, he was again arrested, this time for three days, during which time he was punched and kicked to the point of bleeding. He was told that if he continued his involvement with student activists, he would be rearrested and all of his bones would be broken. In 1996, he was told that he would be killed if he continued to organize student activists. At a student demonstration soon after, riot police beat Agron severely, leaving him covered in blood. Agron's knee was hit so hard that he could not walk. Although two young boys carried Agron away from the scene of the demonstration, he was arrested later that night, put on the floor in a cell, and severely beaten before he was released five hours later. A month later, several men carrying heavy weapons awoke Agron at three in the morning, put him into a van, took him to the top of a hill overlooking Korca, beat him with fists and hard kicks, threatened to kill him, his wife and his children, left him in the street covered in blood, then called his family and told them that he was dead. Soon after, learning that his name had been placed on the Communist government's political death list, Agron and his wife, Ariana, escaped the country. The couple's two children were left with Agron's parents in Albania and have since been taken by a sister living in Greece.

Petitioners entered the United States on or about June 13, 1996, near Calexico, California. On July 18, 1997, the Immigration and Naturalization Service ("INS") issued Notices to Appear, charging Petitioners with being aliens present in the United States without having been admitted or paroled after inspection by an immigration officer as required by law. On September 2, 1997, at a hearing before an immigration judge, Petitioners admitted the factual allegations in the Notices to Appear, conceded removability, then moved for asylum, withholding of removal, or voluntary departure. A hearing on the merits of Petitioners' requests was held on June 30, 1998.

When asked at the hearing whether the government in Albania had changed since he departed, Agron replied that it had only gotten worse. Sotirag Menkshi ("Menkshi"), who at one time worked with Agron in Albania, testified that he (1) saw Agron being arrested; (2) saw that Agron was missing all of his front teeth after his release from prison; and (3) knew that Agron was in and out of police custody and was continuously being threatened while he was still in Albania. Menkshi stated that even though the government had changed in Albania, the same people who had previously beaten Agron so badly were still in power.

The documentary evidence submitted during the hearing included a 1997 U.S. Department of State Country Report for Albania ("Country Report") and a 1998 U.S. Department of State Profile of Asylum Claims for Albania ("Asylum Profile"). While both reports painted an unclear picture of the conditions in Albania in 1997, they were consistent in suggesting that Albanians in 1997 had more basis for concern over crime and unpredictable armed

bands than from political retribution. An addendum to the Asylum Profile stated: "While the settling of accounts persists, there is little evidence that individuals are targeted for mistreatment on political grounds." J.A. 673. The report did not explain what was meant by the "settling of accounts."

Placing significant weight on the Country Report and Asylum Profile, the immigration judge denied Petitioners' applications for asylum and for withholding of removal but granted their request for voluntary departure. While finding that Petitioners had clearly established past persecution, the judge determined that the conditions of the country had changed "to the extent that [Mr. Neli] no longer has a well-founded fear of being persecuted based on his political opinion or membership in the democratic party, republican party or an organization, the landowners' association." J.A. 385. The judge did not make findings as to the severity of the past persecution.

Petitioners filed a timely appeal of the immigration judge's order with the Board of Immigration Appeals ("BIA"). On June 6, 2002, the BIA affirmed without opinion. Petitioners thereafter filed their timely petition for review in this court.

## II. STANDARD OF REVIEW

Where, as here, the Board of Immigration Appeals affirms the decision of an immigration judge without opinion, this court reviews the decision of the immigration judge directly. *Soadjede v. Ashcroft,* 324 F.3d 830, 832 (5th Cir.2003). We re-

view the denial of asylum for abuse of discretion when an immigration judge finds past persecution but no well-founded fear of future persecution. *Belayneh v. INS,* 213 F.3d 488, 491 (9th Cir.2000).

## III. DISCUSSION

Section 208(b) of the Immigration and Nationality Act of 1952, as amended, delegates discretion to the Attorney General to grant asylum to any alien who is a refugee. A refugee is defined as a person who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The alien bears the burden of proving eligibility for asylum. 8 C.F.R. § 208.13(a).

There are three ways an alien may establish his eligibility for asylum. *Krastev v. INS,* 292 F.3d 1268, 1269–70 (10th Cir. 2002). First, an alien may demonstrate a well-founded fear of future persecution. Second, he may establish that he suffered past persecution, in which case he is entitled to a rebuttable presumption in favor of granting asylum. 8 C.F.R. § 208.13(b)(1)(i) (1997). The INS may rebut this presumption by establishing that "since the time the persecution occurred conditions in the applicant's country . . . have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return." *Id.*[2] Third, an alien may demonstrate "compelling reasons for being unwilling or unable to return to the country

**2.** Effective January 5, 2001, the regulation was amended to allow the INS to rebut the presumption by establishing either that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality" or

by establishing that "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . and under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. § 208.13(b)(1)(i) (2001).

arising out of the severity of the past persecution." *Id.* § 208.13(b)(1)(ii). This third approach, which is based on a "general humanitarian principle," was first recognized by the BIA in *Matter of Chen*, 20 I. & N. Dec. 16, 19, 1989 WL 331860 (BIA 1989). As noted in *Chen*:

"It is frequently recognized that a person who—or whose family—has suffered under atrocious forms of persecution should not be expected to repatriate. Even though there may have been a change of regime in his country, this may not always produce a complete change in the attitude of the population, nor, in view of his past experiences, in the mind of the refugee." ... Thus, while the likelihood of future persecution is a factor to consider in exercising discretion in cases where an asylum application is based on past persecution, asylum may in some situations be granted where there is little threat of future persecution.

*Matter of Chen*, 20 I. & N. Dec at 18 (citation omitted); *see also Dobrota v. INS*, 195 F.3d 970, 974 (7th Cir.1999) (explaining that a discretionary grant of asylum is awarded in those rare cases where the past persecution was so severe that it would be inhumane to return the alien to his native country even in the absence of any risk of future persecution).

In this case, the immigration judge found that, while Petitioners had clearly established past persecution, the INS had demonstrated changed country conditions such that Petitioners no longer had a well-founded fear of future persecution. Without addressing the severity of the past persecution suffered by Petitioners, the immigration judge denied their request for asylum. While we find record support for the immigration judge's findings of past persecution and no well-founded fear of future prosecution, we agree with Petitioners' contention that the judge abused his discretion by failing to consider whether the long-term persecution of Agron and his family was sufficiently atrocious to merit a discretionary grant of asylum under *Chen*.[3]

To be sure, the immigration judge acknowledged what is often characterized as "humanitarian asylum" when he stated in his decision that an "alien who does establish past persecution, but not a well-[f]ounded fear of persecution, will be denied asylum unless there is a compelling reason for not returning him which arises out of the severity of the past persecution." J.A. 381. The judge carefully enumerated the instances of Petitioners' past persecution but never addressed whether those instances were sufficiently severe to merit a discretionary award of asylum for humanitarian reasons.

In order for us to properly review the immigration judge's decision, " 'we must understand the basis for [his] decision and how [he] arrived at the findings underlying that decision.' " *Castro–O'Ryan v. INS*, 847 F.2d 1307, 1314 (9th Cir.1987) (quoting *Cardoza–Fonseca v. INS*, 767 F.2d 1448, 1455 (9th Cir.1985), *aff'd on other grounds*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)); *see also Rodriguez–Matamoros v. INS*, 86 F.3d 158, 161 (9th Cir.1996) (noting that "[a]t a minimum, the [immigration judge] must provide an explanation 'sufficient to enable us as a reviewing court to see that the [immigration judge] has heard, considered, and decided' " the matter of humanitarian asylum (quoting *Villanueva–Franco v. INS*, 802 F.2d 327, 330 (9th Cir.1986))). As noted in *Rodriguez–*

---

**3.** Respondents do not argue that Petitioners failed to exhaust their remedies with respect to this claim, and we do not consider whether Petitioners exhausted their humanitarian asylum claim.

*Matamoros,* the need for a clear explanation of the immigration judge's decision is particularly important in *Chen* cases, "because in *Chen* itself, the BIA acknowledged that it was not 'attempt[ing] at this time to delineate the circumstances under which past persecution may or may not be the basis for a successful asylum claim.' " *Rodriguez–Matamoros,* 86 F.3d at 161 (quoting *Matter of Chen,* 20 I & N Dec. at 21); *see also Lopez–Galarza v. INS,* 99 F.3d 954, 963 (9th Cir.1996) (noting that "*Chen* is not an inflexible standard, and we have not attempted to define 'the minimum showing of "atrocity" necessary to warrant a discretionary grant of asylum based on past persecution alone' " (quoting *Kazlauskas v. INS,* 46 F.3d 902, 907 (9th Cir. 1995))).[4]

In this case, absent an explanation by the immigration judge, we have no idea if or why the judge decided against granting humanitarian asylum to Petitioners. We are unwilling, moreover, to assume a decision that is nowhere stated in the immigration judge's order. We are also unwilling to decide the matter in the first instance in a case such as this one, where the persecution was clearly more than minimal. Whether or not Petitioners merit a discretionary award of asylum based on past persecution is a matter that demands the consideration of many factors, "both favorable and adverse, ... with recognition of the special considerations present in asylum cases." *Rodriguez–Matamoros,* 86 F.3d at 161. The immigration judge is in the best position to make that decision; and if, as here, he fails to make that decision clear, he abuses his discretion. *Id.* (stating that the BIA abused its discretion by failing to provide an explanation "sufficient to enable ... a reviewing court to see that the [BIA] has heard, consid-

ered, and decided" the matter of humanitarian asylum).

Here, the persecution of Petitioners included the execution, murder, and lifetime imprisonment of various members of the Neli family, multiple arrests and sometimes severe beatings of Agron himself, and repeated threats of bodily injury and/or death to Agron, his wife and his children. Because the immigration judge altogether failed to address whether this level of persecution was sufficient to merit a grant of asylum for humanitarian reasons, we REMAND for a determination—and a clear explanation-of whether Petitioners' past persecution warrants a discretionary grant of asylum.

PETITION GRANTED.

---

4. We have found no case in which the Sixth Circuit has attempted to define the level of atrocity needed to support a discretionary award of humanitarian asylum.