**Aldiouma KALIDOU, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 02–4245.

United States Court of Appeals, Sixth Circuit.

Aug. 30, 2004.

Dennis Clare, John M. Vickerstaff, Louisville, KY, for Petitioner.

Anthony W. Norwood, Allen W. Hausman, Terri J. Scadron, Emily A. Radford, Efthimia S. Pilitsis, U.S. Department of Justice, Washington, DC, for Respondent.

Before: KEITH and CLAY, Circuit Judges; and O'MEARA, District Judge.[*]

O'MEARA, District Judge.

Petitioner Aldiouma Kalidou, a citizen and national of Mauritania, is seeking review of the Board of Immigration Appeals' order affirming without opinion the Oral Decision and Order of the Immigration Court ordering Petitioner removed to Mauritania. Petitioner seeks a remand directing the Board of Immigration Appeals to enter an order granting his applications for asylum, withholding of removal, and relief under the Convention Against Torture.

## I. BACKGROUND FACTS

Petitioner Aldiouma Kalidou filed an application for asylum and withholding of removal under sections 208 and 241(b)(3) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. §§ 1158 and 1231(b)(3). Petitioner indicated in his application that he is a single male and a native and citizen of Mauritania. He claimed that he fears persecution if he returns to Mauritania on

---

[*] The Honorable John Corbett O'Meara, United States District Court for the Eastern District of Michigan, sitting by designation.

account of his race, membership in a particular social group, and political opinion. Petitioner stated that if he returns to Mauritania, he will be a target of persecution because he is perceived as being an enemy of the government. He further claimed that his father was active in the African Liberation Forces of Mauritania ("FLAM") political group, which has been re-named as the Union of Democratic Forces ("UFD"). According to Petitioner, UFD's primary mission is to resist the discriminatory policies implemented by the Mauritanian government.

Petitioner claimed that his father was sentenced to life in prison as a result of his participation in FLAM activities. Petitioner asserted in his asylum application that his entire family was expelled from Mauritania in 1989 and that they have been beaten and tortured. Petitioner claimed that his family was expelled from Mauritania because they were black.

Petitioner claimed that he joined UFD while he was employed as a driver for the Mauritanian ambassador in Zaire. As a UFD member, he distributed written information about the party; and he attempted to recruit individuals to join the party. After Petitioner joined the UFD, an individual named Hadrami, a senior employee at the embassy, asked Petitioner to return to Mauritania. Petitioner claimed that his mother, who was then living in Senegal, told Petitioner that he could not return to Mauritania because he would be thrown in jail with his father. Petitioner refused to return to Mauritania; and he claimed that as a result, he lost his position with the Mauritanian embassy in Zaire. He then claimed that the Mauritanian Embassy Forces and Zaire Security Forces attempted to apprehend him and return him to Mauritania, but he avoided capture. After that, Petitioner traveled to the United States.

Petitioner Kalidou testified in support of his applications before the Immigration Judge on March 28, 2000, stating that he had not been to Mauritania since December 1986. Petitioner learned from other people that his father has been sentenced to life in prison. He claims he received a letter from Sadu Decemba, along with a picture of his father, one or two months before his March 2000 hearing. However, Petitioner testified that he destroyed the letter because it contained "secrets" about his father that he did not want revealed. He further testified that he himself is a well-known person in Mauritania because he has friends who are soldiers, police officers, and military personnel. Petitioner further stated that the Mauritanian government has not given amnesty to FLAM members for their political activities while they were FLAM members.

While Petitioner was working for the ambassador in Zaire, his mother, brother or brothers, and sister were expelled from Mauritania and went to a refugee camp in Senegal. He testified that his family remains at a refugee camp in Senegal that receives assistance from the United Nations High Commissioner for Refugees ("UNHCR"). Petitioner stated that his family cannot return to Mauritania because they are afraid of the government. Petitioner said that he has received letters from his family, who remain in Senegal, but that he has destroyed those letters because he was afraid his roommates would find the letters. He stated that his family telephones him from the refugee camp.

Petitioner Kalidou testified that Mauritanians who were expelled from between 1988 and 1991 cannot return to Mauritania, but those who merely left because they were scared can return. He is unaware of anyone returning to Mauritania to reclaim property.

Petitioner further testified that while he was working for the ambassador in Zaire he was also being paid by the Mauritanian military, but his salary ceased in 1988. Petitioner testified that he was dismissed from the army in 1988, and he presented a letter from the Mauritanian Ministry of National Defense stating he was dismissed. When asked by the Immigration Judge to show where his name is on the letter, Petitioner identified the name "Bakhalidou" as referring to himself. He explained that he was fired from the military on June 6, 1988, and at that time he used the last name "Bakhalidou." The Immigration Judge then asked Petitioner whether he was a colonel in the army, based on the designation of colonel next to the name Bakhalidou; and Petitioner stated that he was a colonel in the army. However, later in the testimony, Petitioner claimed that he was not a colonel in the military and that another individual, Hamoud, was a colonel in the army.

Petitioner testified that he was fired from his job as the ambassador's chauffeur in December 1995. He asked whether the ambassador could help him get his job back, but the ambassador told him he could not help Petitioner. According to Petitioner, however, the ambassador did assist Petitioner with his travel documents to come to the United States. Petitioner testified that he spoke with the ambassador, who has since retired from the embassy, about three months ago. He testified that he has not received any letters from the ambassador, and Petitioner did not ask the ambassador to write a letter in support of his asylum application.

The Department of State's Country Reports on Human Rights Practices in Mauritania for 1997 ("1997 Country Report") and 1999 ("1999 Country Report") were admitted by the Immigration Judge. The Immigration Judge also admitted the Department of State Profile of Asylum Claims and Country Conditions for 1997 for Mauritania ("1997 Profile"). In the 1997 Country Report, the Department of State reported that the government of Mauritania was making serious efforts to resolve the problems that arose from 1989 through 1991, when 70,000 Mauritanians were either expelled from or fled the country. The report also states that the government in Mauritania did not employ forced exile and that there were no reports of political prisoners. The 1997 Report further states that the Mauritanian government has indicated since 1993 that any Mauritanian outside the country may return.

The 1999 Country Report states that based on informed observers, up to 65,000 people have returned to Mauritania. The 1997 Profile stated that the Mauritanian government has begun returning land to those individuals who were expelled. The 1999 Country Report also states that there were no reports of political killings or politically motivated disappearances. That report also indicates that the UNHCR's refugee program was terminated because so many Mauritanians were returning to their homes.

Petitioner Kalidou submitted several articles, including an article about Mauritanian slavery, which Petitioner's counsel obtained when meeting Sheikh Daddah, the son of Ahmed Daddah, leader of the UFD. The 1999 Country Report notes that Sheikh Daddah was tried and acquitted of legal charges and that the trial was conducted fairly and in accordance with legal procedures.

On March 28, 2000, the Immigration Judge, after considering Petitioner's testimony, his asylum application, the 1997 and 1999 Country Reports, and other documents including those referenced above, concluded that petitioner Kalidou was not

a credible witness. The Immigration Judge noted significant inconsistencies between Petitioner's asylum application, his testimony, the Country Reports, and his documentary evidence. The Immigration Judge also found that Petitioner's explanation as to why he failed to provide certain corroborating evidence was not believable.

Additionally, the Immigration Judge held that even if Petitioner's testimony were found to be credible, Petitioner could not establish that he experienced past persecution or that he reasonably feared persecution or torture in light of changed country conditions in Mauritania. Accordingly, the Immigration Judge denied Petitioner's applications for asylum, withholding of removal, protection under the Torture Convention, and voluntary departure.

On July 29, 2002, the Board of Immigration Appeals ("BIA") affirmed without opinion the decision of the Immigration Judge pursuant to 8 C.F.R. § 3.1(a)(7).

## II. STANDARD OF REVIEW

When the BIA summarily affirms a decision under 8 C.F.R. § 3.1(a)(7), this court will review the decision of the Immigration Judge. *See Fajardo v. INS,* 300 F.3d 1018, 1019 n. 1 (9th Cir.2002). This court reviews factual findings supporting an adverse credibility determination that results in a denial of asylum under the deferential standard of substantial evidence. *Adhiyappa v. INS,* 58 F.3d 261, 265 (6th Cir. 1995). Findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). The standard set out in § 1252 codifies the substantial evidence standard previously set forth by the Supreme Court in *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (citation omitted). *See*

*Dia v. Ashcroft,* 353 F.3d 228, 247–49 (3d Cir.2003).

Section 208(b) of the INA, 8 U.S.C. § 1158(b), confers discretion to the Attorney General to grant asylum to any alien who is a refugee. The alien bears the burden of proving eligibility for asylum. 8 C.F.R. § 208.13(a). There are three ways an alien may establish his eligibility for asylum. *Krastev v. INS,* 292 F.3d 1268, 1269–70 (10th Cir.2002). First, he may demonstrate a well-founded fear of future persecution. Second, the alien may establish that he or she suffered past persecution, in which case the alien is entitled to a rebuttable presumption in favor of granting asylum. 8 C.F.R. § 208.13(b)(a)(i). The INS may rebut this presumption by establishing that "since the time the persecution occurred conditions in the applications country … have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return." *Id.* Third, the alien may demonstrate "compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution." *Id.* § 208.13(b)(1)(ii). *Neli v. Ashcroft,* 85 Fed.Appx. 433, 436–37 (6th Cir.2003).

An applicant who demonstrates qualification for withholding of removal under INA section 241(b)(3) cannot be removed to the country where persecution would occur. "To qualify for mandatory relief under withholding of removal, … [the applicant] must show that it is more likely than not that he will face persecution if he is deported." *Ezeagwuna v. Ashcroft,* 301 F.3d 116 (3d Cir.2002) (quoting *Li Wu Lin v. INS,* 238 F.3d 239, 244 (3d Cir.2001)). This standard is more difficult for aliens to meet than the well-founded fear standard for asylum. Thus, if an alien cannot establish a well-founded fear for asylum, it fol-

lows that he or she cannot meet the withholding of removal standard.

The burden of proof for an applicant seeking protection from removal under the Torture Convention, like that for an applicant seeking withholding of removal under INA section 241(b)(3), is higher than the burden imposed on an asylum applicant. *Ali v. Reno,* 237 F.3d 591 (6th Cir.2001). Because the well-founded fear threshold for asylum eligibility is more lenient than the standard for Torture Convention protection, failure to establish the threshold for asylum forecloses eligibility for protection under the Torture Convention. *See Najjar v. Ashcroft,* 257 F.3d 1262, 1303–04 (11th Cir.2001).

## III. ANALYSIS

The Immigration Judge's finding that petitioner Kalidou lacked credibility is dispositive of his asylum claim. Without credible evidence, Petitioner cannot demonstrate either past persecution or a well-founded fear of future persecution. *See Adhiyappa,* 58 F.3d at 267–68 ("Because the credibility of the asylum seeker is critically important, deference to the Board's determination is appropriate.") Inconsistent testimony and contradictions between an applicant's testimony and other evidence can provide ample support for an adverse credibility finding. *See Pal v. INS,* 204 F.3d 935, 937 (9th Cir.2000).

In this case petitioner Kalidou presented inconsistent statements about matters central to his claim in his testimony, his asylum application, and his documentary evidence. The inconsistencies highlighted by the Immigration Judge involved Petitioner's identity, his dismissal from the military, his family's whereabouts, and the treatment of FLAM members in Mauritania. The Immigration Judge also found that Petitioner testified inconsistently with the documentary evidence presented as to

his family's living conditions in Senegal and about whether FLAM members were receiving amnesty. The significant inconsistencies and the questions surrounding the lack of corroborating evidence substantially support the Immigration Judge's finding that Petitioner failed to meet his burden of proof in establishing eligibility for asylum, withholding of removal, and protection under the Torture Convention.

Even if the Immigration Judge had found Petitioner credible, petitioner Kalidou failed to demonstrate a well-founded fear of persecution in Mauritania because he did not establish past persecution and because of changed country conditions. There is substantial evidence in the record to support these alternative findings.

Petitioner did not claim that he was subjected to any persecution while living in Mauritania. Therefore, his claim rests solely on fear of future persecution. The Immigration Judge's finding that Petitioner has neither an objective nor a subjective fear of persecution is supported by the extensive record of evidence demonstrating that current country conditions in Mauritania have significantly changed. Thus, even if this court were to find evidence in the record so compelling that no reasonable fact finder could have found Petitioner to lack credibility, this alternative holding by the Immigration Judge is correct, and, standing alone, sufficient to deny the petition for review.

Finally, Petitioner raises a challenge to the propriety of the BIA's threshold decision to affirm the Immigration Judge's decision without opinion. However, as recently found by the First, Eleventh, Seventh and Fifth Circuits, the BIA's decision to affirm without opinion is not a constitutional or statutory violation. *See Ciorba v. Ashcroft,* 323 F.3d 539 (7th Cir.2003); *Soadjede v. Ashcroft,* 324 F.3d 830 (5th

Cir.2003); *Gonzalez–Oropeza v. INS*, 321 F.3d 1331 (11th Cir.2003); *Albathani v. INS*, 318 F.3d 365 (1st Cir.2003).

In this case, Petitioner submitted an additional five news releases with his appeal brief that he claims corroborate his testimony before the Immigration Judge: 1) a May 2, 2000 release stating that the leader of the UFD party was arrested and detained for five days; 2) an October 31, 2000 release discussing the Mauritanian government's banning of the UFD Party; 3) a November 7, 2000 release stating that the government used force to break up a demonstration; and 4) two April 2001 news releases discussing the arrest of the leader of another opposition party.

Even if the BIA had taken these new releases into account, they are insufficient to support Petitioner's claims. Petitioner's contention that his case was affirmed without opinion lacks merit.

## IV. CONCLUSION

For the aforementioned reasons, we **AFFIRM** the decision of the Board of Immigration Appeals and **DENY** the petition for review.