**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0716n.06
Filed: November 20, 2008

No. 07-4469

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MARGERITA MARTINI, GJONETO MARTINI, ANTONETA MARTINI, and NIKOLETA MARTINI, | ) ) ) ) | |
| **Petitioners,** | ) ) | **ON PETITION** FOR REVIEW OF AN ORDER OF THE BOARD OF IMMIGRATION APPEALS |
| v. | ) ) | |
| MICHAEL B. MUKASEY, United States Attorney General, | ) ) ) | **O P I N I O N** |
| **Respondent.** | ) ) ) | |

Before: MOORE, GRIFFIN, and BRIGHT,[*] Circuit Judges.

KAREN NELSON MOORE, Circuit Judge. Petitioners, Margerita Martini ("Martini")

and her three children, Gjoneto Martini ("Gjoneto"), Antoneta Martini, and Nikoleta Martini

(collectively "the Martinis"), seek review of the Board of Immigration Appeals' ("BIA") order

affirming the immigration judge's ("IJ") denial of their applications for asylum and withholding of

removal. The Martinis argue that the IJ abandoned her neutral role when questioning Martini and

that the BIA abused its discretion when it affirmed the IJ's decision to deny the Martinis' petition

for asylum and withholding of removal on the grounds that Martini was not credible. For the reasons

---

[*]The Honorable Myron H. Bright, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

discussed below, we **DENY** the petition for review of the BIA's order denying the Martinis asylum and withholding of removal.

## I. BACKGROUND[1]

Martini, an Albanian citizen, was born in Kosan, Albania in 1966. She married Arben Martini in 1986, and the couple has three children. Both her family and her husband's family opposed Communist rule in Albania and, as a result, suffered assassination attempts, imprisonment, and other forms of persecution while the Communists controlled the country. Martini and her husband were active in the Democratic Party ("DP") and participated in demonstrations and protests against the Communist government.[2]

From 1992 to 1997, when the DP controlled the government, the Martini family was not persecuted. The events supporting the Martinis' petition for asylum began after the Socialist Party ("SP"), a coalition party that evolved from the former Communist Party, gained power. According to Martini's statement accompanying her family's application for asylum and withholding of removal, the Martinis' problems began with threatening phone calls and letters. Martini's statement asserts that these threats "became more concrete" when, on June 20, 1999, Communists attempted to kill her husband by shooting at his car. Joint Appendix ("J.A.") at 382 (Martini Stmt. at 2); J.A. at 200-05 (Hr'g Tr. at 73-78). At her merits hearing, Martini testified that six months before this

---

[1]The facts described in this section are drawn from testimony and evidence presented by the Martinis. Relevant inconsistencies are noted.

[2]At the merits hearing, the government stipulated that if Martini were to testify about events prior to the fall of the Communist regime in Albania, her testimony would be consistent with the information contained in her application.

shooting, the nephew of the head of the SP tried to kill her husband by forcing his car off the road. J.A. at 200-05 (Hr'g Tr. at 73-78). During this period her husband was also beaten by the police.

As a result of these events, Martini's husband left Albania for the United States on June 29, 1999. J.A. at 207-08 (Hr'g Tr. at 80-81). Martini testified that shortly after her husband left Albania, two attempts were made to kidnap her son, Gjoneto. The first time, four days after her husband left the country, some men approached Gjoneto and told him that they were friends of his father and that they wanted to give him a ride. Gjoneto ran away from these men and was not harmed. The second time, a Muslim-Communist man that Martini knew approached her while she was walking home with Gjoneto and told her that he was going to "replace" her husband and kidnap her son. J.A. at 210-11 (Hr'g Tr. at 83-84). Gjoneto also testified regarding these events.

Martini testified that, in response to these incidents, her husband returned to Albania on July 9, 1999 to try to get Gjoneto out of Albania. J.A. at 220 (Hr'g Tr. at 93). Because the American embassy in Albania was closed at the time, the Martinis tried to get their son a visa in Bulgaria. The first time her husband and son tried to go to Bulgaria, the border officials would not let them leave Albania without permission from the child's mother. Martini executed a letter giving her permission for Gjoneto to leave Albania,[3] and Gjoneto and her husband went to Bulgaria but were unable to obtain a visa. Following this failure, Martini and her husband sent Gjoneto out of Albania with a friend, hoping that the friend could get their son to the United States. Because Gjoneto had no

---

[3]At the hearing, Martini identified a document as the letter that she had notarized giving permission for her husband to take her son across the Bulgarian border. J.A. at 226-234 (Hr'g Tr. at 99-107). However, as the IJ noted, the document that she identified refers to events (i.e. her son's trip to Italy) that, according to Martini's narrative, occurred after her son and husband tried to go to Bulgaria. *Id.*; J.A. at 439 (Notarial Stmt.).

3

documentation, he was stopped in Italy and held in a center for nine months before he was returned to Albania on July 26, 2000. Gjoneto also testified regarding the attempts to get him out of Albania.

In February 2000, Martini's husband returned to the United States.[4] The final persecution that Martini described was her rape on October 16, 2000. Martini testified that as she was leaving a DP Women's Union meeting, a police van stopped her. Officers got out, called her and her husband "rotten Democrat[s]," and forced her into the van with a gun. J.A. at 242-43 (Hr'g Tr. at 115-16). She testified that the masked officers[5] who took her continued to touch and insult her once she was in the van. These men took her to the police station where she was raped by four or five men over the course of a few hours. Martini testified that after this violent event, she moved in with her relatives and did not go out in public until she came to the United States. Martini first testified that she did not see a physician in Albania after she was raped, but when she was shown a report from an Albanian doctor, Martini admitted that she saw a criminology doctor in Albania after the assault, but was later treated in Yugoslavia only.[6] J.A. at 254-66 (Hr'g Tr. 127-39). On redirect

---

[4]From February 2000 on, Martini's husband remained in the United States. He applied for asylum separately from his wife and children. An IJ found Arben Martini not credible and denied his petition for asylum. *Martini v. Ashcroft*, 104 F. App'x 562, 563 (6th Cir. 2004). The BIA affirmed, and this court denied his petition for review. *Id.*

[5]The Martinis submitted a sworn statement from a woman in Albania who knew about Martini's rape. This document states that "masked civilians" assaulted Martini and does not mention the police. J.A. at 375 (Zace Stmt.). When asked about this discrepancy, Martini testified that she had been raped by police *and* civilians. J.A. at 330 (Hr'g Tr. at 203).

[6]At the Martinis' hearing, the government pointed out that the passport Martini used to enter the United States was issued before her rape but had no stamps on it indicating entry into Yugoslavia even though Martini testified that her passport had been stamped when she left Albania for medical treatment. J.A. at 275-81 (Hr'g Tr. 148-54). Martini explained that she had been issued a new passport because the people who brought her to America said she needed one and that her old passport was still in Albania. *Id.*

4

examination, Martini stated that as a result of the rape she became pregnant and had an abortion in Yugoslavia. She testified that she had not told anyone about this pregnancy or its termination before this redirect examination. J.A. at 309 (Hr'g Tr. at 182:18-25).

On April 30, 2001, Martini and her three children left Albania. After spending a night in Yugoslavia, the family arrived in the United States on May 1, 2001. The Martinis lacked valid documents, and the Immigration and Naturalization Service ("INS"), the agency responsible for immigration matters at the time the Martinis arrived in the United States, started removal proceedings against them. *See* 8 U.S.C. § 1182(a)(7)(A)(i). Martini appeared before an IJ on August 28, 2002, and conceded removability.[7] A merits hearing was held on December 8, 2005. Martini testified regarding the events described above, and she told the IJ that she was afraid to return to Albania because the people who had threatened and hurt her family were still alive and powerful.

On December 8, 2005, the IJ issued an oral decision denying the Martinis asylum and withholding of removal on the grounds that Martini's testimony was not credible. In addition to detailing a number of specific inconsistencies, the IJ found that the "complete lack of corroborating evidence" "further undermined" Martini's credibility. J.A. at 66 (IJ Decision at 36). The IJ explained that she would have expected testimony from Martini's husband and from some of their family members who had ostensibly been granted asylum in the United States.

The IJ also found that "there has been a sufficient change in country conditions such that even if this Court were to find that the respondent established past persecution (which it does not

---

[7]At this master calendar hearing, the IJ waived the requirement that petitions for asylum be filed within one year of arrival because of a change in the applications and an error by the clerks' office. The BIA treated this matter as timely, and neither party raises any claims pertaining to timeliness on appeal. Accordingly, we treat the petition for asylum as timely.

because it does not find the respondent is credible) that the respondent does not have a well-founded fear of future persecution." J.A. at 71 (IJ Decision at 41). The IJ highlighted the fact that Martini's husband had returned to Albania after reaching the United States and that Martini had returned to Albania from Yugoslavia. Finally, the IJ found that the Martinis had not shown that relocation within Albania was impossible.

The Martinis appealed the IJ's denial of asylum and withholding of removal to the BIA. The Martinis argued that the IJ had deprived them of due process by rigorously questioning Martini and thus acting more as a "second prosecutor" than an "impartial adjudicator." J.A. at 108 (Resp. Br. at 9). They also argued that Martini was credible and that they had presented enough evidence to entitle them to asylum. Finally, the Martinis asserted that the IJ had erroneously relied "on her adverse credibility finding and the denial of [the Martinis'] asylum claim" when denying the family's withholding of removal and CAT claims. J.A. at 117-18 (Resp. Br. at 18-19). On November 5, 2007, the BIA issued an opinion adopting and affirming the IJ's decision with some additions. The BIA found that the IJ's "adverse credibility finding is sufficiently supported by the record." J.A. at 7-8 (BIA Order). The BIA explained its affirmation of the IJ's adverse credibility finding as follows:

> The Immigration Judge identified various discrepancies in the lead respondent's testimony which go to the heart of her claim. The respondent testified that in October of 2000, she was detained by police and raped; however, a document submitted on her behalf indicates that she was stopped and raped by masked civilians. The respondent also testified, that after her rape, she did not seek medical treatment in Albania. However, she has submitted a document from a doctor in Albania stating that she was presented in the clinic due to the violence committed against her at the police station. In addition, the witness testified that Mr. Pjeter Abnori knew about the respondent's rape; however, in a document Mr. Abnori submitted he makes no mention that the respondent was raped.

6

*Id.* The BIA found no evidence that the IJ was biased or that the IJ's conduct prejudiced the Martinis.

In their petition for review under 8 U.S.C. § 1252, the Martinis make two claims. First, the family claims that by interrupting Martini's counsel and asking her "combative" questions during the hearing, the IJ abandoned her impartial, judicial role. They assert that the IJ retained her biases from her prior job as a DHS attorney and that by acting as a "second advocate," the IJ deprived the Martinis of a full and fair hearing. Martini Br. at 14-15. Second, the Martinis argue that they supported their applications with "direct, credible, and persuasive evidence" warranting asylum, withholding of removal, or humanitarian asylum. *Id.* at 15.

## II. ANALYSIS

### A. Standard of Review

"When the BIA does 'not summarily affirm or adopt the IJ's reasoning and provide[s] an explanation for its decision, we review the BIA's decision as the final agency determination.'" *Fang Huang v. Mukasey*, 523 F.3d 640, 651 (6th Cir. 2008) (quoting *Ilic-Lee v. Mukasey*, 507 F.3d 1044, 1047 (6th Cir. 2007)). We review findings of fact using the "substantial evidence standard" under which "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Ndrecaj v. Mukasey*, 522 F.3d 667, 672-73 (6th Cir. 2008) (internal quotation marks omitted).

### B. Due-Process Claim

On appeal, the Martinis argue that the IJ deprived them of a full and fair hearing by acting as a biased second prosecutor. We have adopted the following standard for evaluating due-process claims in removal proceedings:

We review de novo alleged due process violations in removal hearings. *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998). We have stated that "Fifth Amendment guarantees of due process extend to aliens in [removal] proceedings, entitling them to a full and fair hearing. To constitute fundamental unfairness, however, a defect in the removal proceedings must have been such as might have led to a denial of justice." *Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001) (internal quotation and citations omitted). Thus, "proof of prejudice is necessary to establish a due process violation in an immigration hearing." *Warner v. Ashcroft*, 381 F.3d 534, 539 (6th Cir. 2004). Therefore, reviewing an alleged due process violation is a two-step inquiry: first, whether there was a defect in the removal proceeding; and second, whether the alien was prejudiced because of it.

Though "[t]he IJ is afforded broad discretion to control the manner of interrogation in order to ascertain the truth," *Mikhailevitch*, 146 F.3d at 391 (internal quotation omitted), we have recognized that "[a] neutral judge is one of the most basic due process protections." *Reyes-Melendez v. INS*, 342 F.3d 1001, 1006 (9th Cir. 2003) (internal quotation omitted); *see also Ahmed v. Gonzales*, 398 F.3d 722, 725 (6th Cir. 2005) ("It is undisputed that petitioners in such proceedings are entitled to an unbiased arbiter who has not prejudged their claims.").

*Vasha v. Gonzales*, 410 F.3d 863, 872 (6th Cir. 2005); *see also Ndrecaj*, 522 F.3d at 673.

The Martinis present little evidence to support their due-process claim, but they assert that the IJ repeatedly "took over the questioning" of Martini. Martini Br. at 14-15. The Martinis argue that this questioning "suggests that [the IJ] retained her biases from her work for the INS and DHS." *Id.* Federal law empowers an IJ to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1). There is no indication from the record that the IJ abused or overstepped these statutory powers. The IJ's oral decision specifically delineated the inconsistencies that led the IJ to conclude that Martini was not credible. J.A. at 32-74 (IJ Decision at 2-44). *Cf. Ndrecaj*, 522 F.3d at 673 (finding no due process violation in part because "[t]he IJ gave a detailed description of all of the inconsistencies that he identified and then explained how those inconsistencies supported his finding . . ."). The IJ's questions here explored potential inconsistencies, and the IJ ruled against the Martinis, but the Martinis have

presented no evidence that the IJ abandoned her impartial role. *See Balliu v. Gonzales*, 192 F. App'x 427, 434-35 (6th Cir. 2006) (unpublished opinion) (finding no due-process violation where "the transcript of the hearing shows no intimidating or hostile conduct on the part of the IJ"); *Malaj v. Gonzales*, 199 F. App'x 453, 460 (6th Cir. 2006) (unpublished opinion) ("While the IJ was an assertive questioner of Malaj, and was occasionally brusque, our review of the record does not reveal that the IJ was biased or that Malaj was unable to present her case fully."). Accordingly, we conclude that the Martinis have not shown a violation of their due-process rights.

## C. Asylum Claim

The Martinis next argue that the IJ and BIA erred in denying the Martinis asylum. To qualify for asylum, an applicant must prove that he or she is a refugee who cannot or will not return to his or her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *see Ndrecaj*, 522 F.3d at 674. Once the applicant has made this showing, he or she must "merit[] a favorable exercise of discretion by the IJ." *Mapouya v. Gonzales*, 487 F.3d 396, 406 (6th Cir. 2007). To establish past persecution, the applicant must show "more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998); *see also Ndrecaj*, 522 F.3d at 674. An applicant "does not need to establish that his government is more likely than not to persecute him" in order to show a well-founded fear of persecution. *Ndrecaj*, 522 F.3d at 674.

The testimony of an applicant, without more, can be enough to establish past persecution or a well-founded fear of persecution. *Id.*; 8 U.S.C. § 1158. However, stand-alone testimony suffices

only if the trier of fact finds that testimony credible. *Ndrecaj*, 522 F.3d at 674. We review adverse

findings of credibility under the following standard:[8]

> Credibility determinations are considered findings of fact, and are reviewed under the substantial evidence standard. *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004). This is a deferential standard: A reviewing court should not reverse "simply because it is convinced that it would have decided the case differently." *Klawitter v. INS*, 970 F.2d 149, 151-52 (6th Cir. 1992) (internal citations omitted). While an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons. *See Daneshvar v. Ashcroft*, 355 F.3d 615, 623 n.7 (6th Cir. 2004); *Gao v. Ashcroft*, 299 F.3d 266, 276 (3d Cir. 2002) ("The reasons must be substantial and bear a legitimate nexus to the finding."). An adverse credibility finding must be based on issues that go to the heart of the applicant's claim. They "cannot be based on an irrelevant inconsistency." *Daneshvar*, 355 F.3d at 619 n.2 (6th Cir. 2004). "If discrepancies 'cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility.'" *Id.* at 623 (quoting *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir. 2000)).

*Sylla v. INS*, 388 F.3d 924, 925-26 (6th Cir. 2004).

As the BIA noted, some of the discrepancies cited by the IJ undermine Martini's credibility

and go to the heart of her claim. The BIA specified contradictions surrounding Martini's rape,

including where and when Martini sought treatment, the identity of the individuals who raped

Martini, and the failure of people who allegedly knew about the rape to mention it in their affidavits

as supporting a finding that Martini was not credible. *See* J.A. at 7-8 (BIA Order). Even assuming

that not all of the inconsistencies noted by the IJ go to the heart of the Martinis' claims, the BIA and

the IJ identified enough serious inconsistencies that we cannot say that any reasonable fact finder

---

[8]As part of the REAL ID Act of 2005, Congress amended 8 U.S.C. § 1158(b)(1)(B)(iii) to state that credibility determinations may be made "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." *See Amir v. Gonzales*, 467 F.3d 921, 925 n.4 (6th Cir. 2006). This change does not affect this case because it pertains only to aliens who apply for asylum on or after May 11, 2005. *Id.*

would have found otherwise.  *See Ndrecaj*, 522 F.3d at 672-73.  Accordingly, we must deny the Martinis' petition for review of the BIA's decision to deny asylum.

**D.  Withholding of Removal Claims**

Martini also appeals dismissal of her claims for withholding of removal under the Immigration and Nationality Act ("INA") and the Convention Against Torture ("CAT").  Both of these claims are reviewed under the same standard. *Ndrecaj*, 522 F.3d at 677.  We must "uphold the BIA's determination against withholding the removal of an alien, unless it is manifestly contrary to the law.  Furthermore, any administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (internal quotation marks omitted).  As discussed above, because the IJ described inconsistencies that go to the heart of the Martinis' claims, we cannot say that denial of withholding is manifestly contrary to law.

Additionally, in order to qualify for withholding under the INA, an applicant must show past persecution or that "'it is more likely than not that he or she would be persecuted'" because of "'race, religion, nationality, membership in a particular social group, or any political opinion.'" *Id.* (quoting 8 C.F.R. § 208.16(b)).  Similarly, an applicant must show that "'it is more likely than not that he or she would be tortured if removed to the proposed country of removal'" in order to qualify for withholding under the CAT. *Id.* (quoting 8 C.F.R. § 208.16(c)(2)).  These substantive standards that must be met to qualify for withholding of removal under the INA or the CAT are more stringent than the one applied to claims for asylum.  Therefore, because the Martinis are not eligible for asylum, it necessarily follows that they are not eligible for withholding of removal under either the INA or the CAT. *Id.*  Given this standard of review, we deny the Martinis' petition for review of the BIA's decision to deny withholding of removal.

11

### E. Humanitarian-Asylum Claims

Finally, the Martinis argue that they are eligible for humanitarian asylum under 8 C.F.R. § 1208.13(b)(1)(iii)(B). The Martinis raised this claim before the IJ and the BIA, but neither expressly ruled on this issue. Humanitarian asylum is a type of discretionary relief that is granted to asylum seekers who cannot show that they have a "well-founded fear of persecution" but who have "established that there is a reasonable possibility that [they] may suffer other serious harm upon removal" to the applicant's country of nationality. 8 C.F.R. § 1208.13(b)(1)(iii)(B). We have explained that this "'[other-serious-harm] provision provides a second avenue of relief for *victims of past persecution* whose fear of future persecution on account of a protected ground has been rebutted by evidence of changed country conditions or of safe harbors within his or her home country.'" *Ben Hamida v. Gonzales*, 478 F.3d 734, 741 (6th Cir. 2007) (quoting *Liti v. Gonzales*, 411 F.3d 631, 641-42 (6th Cir. 2005)) (emphasis added) (citation omitted).

We have stated that "it is the BIA, rather than this court, which is the proper forum" to address initially a claim for humanitarian asylum. *Liti*, 411 F.3d at 642. Accordingly, in an appropriate case, if the BIA failed to address explicitly a request for humanitarian asylum, we would remand the case to allow the BIA to make that determination. *See, e.g., Neli v. Ashcroft*, 85 F. App'x 433, 437-38 (6th Cir. 2003). The Martinis' case, however, does not require remand. As detailed above, the Martinis have not presented credible evidence of past persecution or a well-founded fear of persecution. Because a showing of past persecution or a well-founded fear of persecution is an essential element of a successful humanitarian-asylum claim, the Martinis cannot succeed on this

claim and are ineligible for humanitarian asylum.[9] *See Ben Hamida*, 478 F.3d at 741 ("[Petitioners] have failed to offer credible evidence that they were persecuted in Tunisia. Therefore, their claim for humanitarian asylum must fail."). Thus, we deny the Martinis' petition seeking review of the BIA's failure to consider their claims for humanitarian asylum.

### III. CONCLUSION

For the reasons discussed above, we **DENY** the Martinis' petition for review of the BIA's order denying them asylum, withholding of removal, and, impliedly, humanitarian asylum.

---

[9]Even though a finding that an asylum seeker cannot establish past persecution encompasses an implied denial of a claim for humanitarian asylum, we encourage IJs and the BIA to decide explicitly whether humanitarian asylum is proper and to explain their rationale when applicants present requests for humanitarian asylum.