NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0265n.06
Filed: April 14, 2006

Case No. 04-4247

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| LEONARD KALAJ-PALI, et al., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| ALBERTO GONZALES, Attorney General, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| | ) | |

BEFORE: BOGGS, Chief Judge, and BATCHELDER, Circuit Judge; WEBER, District Judge.[*]

ALICE M. BATCHELDER, Circuit Judge. Petitioner, Leonard Kalaj-Pali ("Mr. Kalaj"),

appeals the decision of the Board of Immigration Appeals ("BIA") denying him and his family relief

under the political asylum provisions of the Immigration and Naturalization Act. On September 17,

2004, the BIA affirmed the decision of the Immigration Judge ("IJ") to deny petitioners relief and

remove them from the United States. The IJ found the petitioners to be credible, but determined that

they did "not provide sufficient grounds to establish eligibility for asylum." In affirming the IJ's

decision, the BIA agreed "that the respondent failed to meet his burden of proving past persecution

or a well-founded fear of future persecution based on a protected ground in the [Immigration and

_____

[*]The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

Nationalization Act]." Because the IJ and the BIA erred in failing to find the petitioners eligible for asylum, we reverse and remand.

## I.

Petitioners are natives and citizens of Albania. Leonard Kalaj and his family left Albania in May 1999. After traveling through parts of Europe, the family flew to Mexico and entered the United States near Brownsville, Texas, without inspection on or about June 4, 1999, at which time they were arrested, detained, interviewed, and issued Notices to Appear. Upon release, the Kalaj family left Texas and joined Mr. Kalaj's two brothers in Michigan. There, they filed an Application for Asylum, Withholding of Removal and/or Convention Against Torture, and a Motion to Change Venue. The venue motion was granted on October 20, 1999, and after a series of motions and extensions not at issue here, an immigration hearing was held on March 14, 2003.

The U.S. Attorney General has discretion under the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1158(a), to grant asylum to a "refugee." *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994). The INA defines a "refugee" as an alien who is unable or unwilling to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." (8 U.S.C. § 1101(a)(42)(A)). Thus, there are two methods by which an asylum applicant may establish his eligibility: (1) the applicant can prove that he has suffered past persecution, or (2) the applicant can show that he has a well-founded fear of future persecution. *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005). Petitioners argue that they fall within the INA's enumerated categories, and they rely on the following facts to demonstrate that they have suffered past persecution and fear future persecution on account of their political opinion and membership in Albania's Democratic Party.

The Kalaj family boasts a long and distinguished history of resisting Albania's communist regimes, and supporting pro-democracy efforts. The Communist Party arrested Mr. Kalaj in 1990 for demonstrating against the Communist government, and sentenced him to death for his dissidence. With communism's imminent demise, however, Mr. Kalaj was released after only 5 days. Communism did in fact collapse in Albania, and from 1991 to 1997 the Kalaj family enjoyed relative peace and prosperity under the new Democratic Party. Mr. Kalaj was appointed Head of his city's Road Commission Office, a position he held from 1992 to 1997. His brother, Paulin Kalaj, served as undersecretary to the Mayor of Shkodra, the major city in Northern Albania, and was awarded the Medal of Bravery from Albania's President in 1995 for his courage in the 1990 anti-Communist demonstrations. In 1996, Mr. Kalaj reprised his role as campaign manager to a Democratic Party member of Parliament, and was well-regarded within the Party. But in 1997 the Socialist Party defeated the Democrats in a democratic election. According to petitioners, the Socialist Party merely reconstituted the old Communist Party regime and began intimidating and punishing those who favored democracy and the Democratic Party. Three primary events over the course of approximately 13 months led the Kalaj family to flee Albania and apply for asylum in the United States.

The first incident occurred early in 1998, shortly after the Socialist Party's electoral victory. On February 22, 1998, Mr. Kalaj demonstrated against the Socialist government. On the night of February 23, 1998, six men wearing masks and armed with automatic weapons confronted Kalaj and his wife and told them that they must leave Albania because of their support for the Democratic Party. One of the men grabbed Mrs. Kalaj by her wrist and yanked her arm. When she tried to escape, her assailants caught her, scratched her arm, inflicting possibly permanent nerve damage.

3

The gunmen pointed their guns under the petitioners' chins, hit Mr. Kalaj in the face and body with the butts of their rifles, verbally abused them both, and told them that if they did not leave Albania they would be "eliminated." Although the assailants did not wear government insignias, they threatened to incarcerate the couple and the petitioners believed the men to be acting on behalf of the Socialist government in order to intimidate Democratic opposition.

After this February incident, Mr. Kalaj feared further harassment and threats, and he altered his daily routines and kept his family indoors as much as possible. In March 1998, his brother, Paulin Kalaj, was forced to resign his political position in the county government; he fled Albania for fear of persecution. Undaunted, Mr. Kalaj cautiously and inconspicuously organized, coordinated and participated in several more protests and anti-Socialist events.

Then, on December 20, 1998, as Mr. Kalaj and his wife were riding their bicycles home from Mrs. Kalaj's office, they thought that they heard gunshots. They saw two men standing by the nearby Catholic cemetery and another man on the sidewalk. The unidentified man on the sidewalk gestured toward them as if slitting his throat, which petitioners took to be a life-threatening warning. Although they were unharmed and not robbed or even verbally threatened, they left their bicycles and ran to their home nearby.

The third and final incident prompting the Kalajs's flight occurred on March 28, 1999, when their daughter, Josefina Kalaj, found a note under the family's front door. According to testimony, the handwritten note read: "Leonard Kalaj, a Democrat, if for a period of one month, you and your family don't leave the country, we are going to kill you and your family." Mr. Kalaj tore up the letter, but soon began making arrangements to leave Albania. Within weeks he applied for a visa at the Italian Embassy, and one week later Mr. Kalaj's name appeared in the newspaper indicating

4

to the Socialist Party that he intended to leave the country. Italy denied the petitioners political asylum, and the family ultimately came to the United States to join Mr. Kalaj's brothers, Robert and Frederick Kalaj, who were already living in Michigan.

Beyond these direct and personal threats, petitioners point to what they believe to be other anti-Democratic intimidation and persecution taking place in their neighborhood during the same period. Most notably, petitioners testified about the murder of a young neighbor whose father had been active in the Democratic Party. Furthermore, according to Josefina Kalaj, another member of the Democratic Party had received a threatening note similar to the one slipped under the Kalajs' door, and was later shot dead. Petitioners argue that these incidents, taken with the family's political history and Mr. Kalaj's earlier imprisonment in 1990, qualify them for asylum based upon their membership in a particular social group and political opinion as required under the INA.

## II.

After a hearing on March 14, 2003, the Immigration Judge denied the Kalaj family's application for asylum. On appeal to the BIA, petitioners challenged the IJ's ruling that the family was ineligible for asylum, as well as the fundamental fairness and conduct of the immigration proceedings. The BIA adopted and affirmed the IJ's decision, noting that petitioners had "failed to meet [the] burden of proving past persecution or a well-founded fear of future persecution based on a protected ground in the Act."[1]

When the BIA issues an order without opinion, we review the IJ's decision as the final agency decision. *Denko v. INS*, 351 F.3d 717, 726 (6th Cir. 2003). In this case, the BIA summarily

---

[1]The IJ also denied the petitioners protection under the Convention Against Torture, noting that there was "no evidence in this record which establishes that the government of Albania has either been involved in or acquiesced in . . . the threat of torture to the respondent or his family members." Because we decide this case on other grounds, we do not revisit this determination.

adopted the IJ's decision, while adding a comment on the petitioners' argument that the initial proceedings lacked fundamental fairness and rejecting petitioners' due process claim. We therefore directly review the IJ's decision while considering the BIA's additional comment, and because the due process claim was not before the IJ, we directly review the BIA decision on that claim. *Gilaj*, 408 F.3d at 282-83. To reverse the BIA's factual determinations, we must find that the evidence not only supports a contrary conclusion, but compels it. *Klawitter v. INS*, 970 F.2d 149, 152 (6th Cir. 1992). "The petitioner must demonstrate 'that the evidence presented was so compelling that no reasonable factfinder could fail to find the requisite persecution or fear of persecution.'" *Gilaj*, 408 F.3d at 283 (quoting *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003)). We may reverse the BIA only if "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Under this highly deferential standard of review, we must uphold the decisions below if they are "'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Koliada v. INS*, 259 F.3d 482, 486 (6th Cir. 2001) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). We recognize that we may not reverse "simply because [we are] convinced that [we] would have decided the case differently." *Adhiyappa v. INS*, 58 F.3d 261, 265 (6th Cir. 1995) (internal quotation marks omitted).

In reviewing the IJ's determination here, we note the limited grounds on which she based her decision to deny Mr. Kalaj asylum. The IJ held:

> At best, taking as absolutely credible the three incidents, only the first incident is there any indication of any political nexus at all. The second incident, as noted by Government counsel, could have been a possible kidnapping, activity by criminals, threats by criminals against an individual who was perceived as wealthy, who owned his own company, his wife was employed by the national telephone company, was well-to-do, [sic] Indeed, the third incident, the note in March of 1999, again, based on the credible testimony which was proffered, has no link or nexus to the respondent's activity as a Democrat.

6

After applying the statutory requirements for establishing asylum eligibility and discussing the testimony and evidence presented at the hearing, the IJ concluded that although Mr. Kalaj testified credibly, he had failed to meet "the burden of establishing that the harm which he fears in Albania is linked to a ground on which this Court can consider his application for asylum." Significantly, the IJ's decision focused only on the necessary nexus between the persecution the Kalaj family suffered and the political motives of their tormenters. The IJ never suggested that Mr. Kalaj did not suffer persecution, but found only that the harm threatened could not convincingly be attributed to political motive in order to support the asylum application. We hold that the record compels a contrary conclusion.

Because the IJ found Mr. Kalaj "absolutely credible" and did not dispute that the incidents of violence and intimidation rise to the level of persecution within the meaning of 8 U.S.C. § 1101(a)(42)(A), we need not consider the severity of the incidents or whether Mr. Kalaj and his family suffered persecution. Rather, as the IJ has framed the issue, we assume that the family was indeed persecuted, and we now look solely to whether the record compels the finding of a political nexus such that Mr. Kalaj has met his burden of showing persecution on a protected and enumerated ground under the INA. We hold that it does.

First, the IJ discounted Mr. Kalaj's activity in the Democratic Party and his service as campaign manager to Pjeter Pepa, a Democratic member of the Albanian Parliament. Mr. Kalaj ran Pepa's election campaign in 1996, the year before the Socialist Party claimed control and began to employ intimidation tactics reminiscent of the recently deposed Communist regime that Mr. Kalaj and his family had actively worked to overthrow. As a campaign manager and Head of the city's Road Commission, Mr. Kalaj's prominence within the Democratic Party rose and his political

7

profile had increased to the point that it is entirely reasonable that his political adversaries knew of his role and his political opinion, and, once the Democratic Party was no longer in power, would threaten him with harm. In downplaying Mr. Kalaj's position within the party, the IJ observed that "he held no position in the party other than the two occasions [as campaign manager] in 1992 and 1996," and that "his activities from 1992 to 1996 were quite limited." The IJ also discounted Mr. Kalaj's political activity in 1998, noting that despite his status in the Democratic Party, Mr. Kalaj only participated in two political rallies in that year, and he did so "inconspicuous[ly]." In underestimating Mr. Kalaj's involvement this way, the IJ failed to consider the political reality in Albania from 1992 to 1998, and the hostilities that a family such as the Kalajs, who were known to have opposed the Communist and Socialist regimes, would have risked had they *openly* campaigned, organized, and rallied against the Socialist Party. That Mr. Kalaj cautiously campaigned infrequently and "inconspicuously" in a time of political upheaval and in the wake of his own party's fall from power, does not negate his known political participation or status, or detract from the danger that he faced on account of it.

Second, on the night of February 23, 1998, Mr. and Mrs. Kalaj were beaten and threatened at gunpoint by masked men who they believed to be Socialist Party agents. Calling him a Democrat, the assailants struck Mr. Kalaj with a rifle, pointed their guns at the couple, threatened them with imprisonment, and warned them to leave the country because they supported the Democratic Party and process. Petitioners admit that they could not identify the gunmen, but convincingly argue that street-thugs and highwaymen do not typically speak of politics, threaten incarceration, or leave their comparatively wealthy victims with their money untouched. Thus, petitioners reasonably deduced that the masked men were likely Socialist operatives sent to intimidate an influential member of the

8

Democratic Party. The IJ acknowledged that the circumstances of this first incident indicated a political nexus. The IJ erred, however, in suggesting that *only* this incident had a political nexus.

Though it is difficult to ascribe any particular motive to the second incident – in which unidentified men made threatening gestures toward Mr. and Mr. Kalaj – we have no such difficulty with the third incident, which occurred on March 28, 1999. The threatening note slipped under the Kalajs's apartment door specifically targeted Mr. Kalaj on account of his political affiliation and threatened death to him and his family. The IJ mistakenly stated that the note may not have included the word "Democrat," but the Government concedes on appeal that the note in fact read, "Leonard Kalaj, a Democrat, if for a period of one month, you and your family don't leave the country, we are going to kill you and your family." The note establishes a direct connection between a grave threat to Mr. Kalaj and his political opinion and affiliation. The IJ erred in finding it "most persuasive" that "the only incident where the Socialist Party arguably could have been involved" occurred 13 months before the Kalajs's exodus. We find that the record compels the finding of a clear nexus between Mr. Kalaj's political activities and the undisputed persecution that he and his family suffered.

Petitioners also argue that the IJ violated their Fifth Amendment due process right to a fair trial, and appeal the BIA's determination to the contrary. Similarly, petitioners challenge the constitutionality of the INA's requirement that an alien must reside in the United States for at least one year prior to receiving a Notice to Appear in order to qualify for voluntary departure. Because we reverse and remand the IJ's decision on other grounds, we need not reach the constitutional questions petitioners raise. *See Alma Motor Co. v. Timken-Detroit Axle Co.*, 329 U.S. 129, 136 (1946) ("If two questions are raised, one of non-constitutional and the other of constitutional nature,

9

and a decision of the non-constitutional question would make unnecessary a decision of the constitutional question, the former will be decided.").

## CONCLUSION

For the foregoing reasons, we **REVERSE** the IJ's determination that the petitioners are not eligible for asylum, and we **REMAND** for further proceedings consistent with this opinion.